Filed 9/30/20  In re T.D.M. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

<table>
<tr><td>In re T.D.M. et al., Persons Coming Under the Juvenile Court Law.</td><td></td></tr>
<tr><td>DEL NORTE COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>C.H.,<br><br>     Defendant and Appellant.</td><td>A160071<br><br>(Del Norte County<br> Super. Ct. Nos. JVSQ17-6084,<br> JVSQ17-6086)</td></tr>
</table>

In this dependency matter, after C.H. (Mother) failed to reunify, the juvenile court terminated her parental rights to T.T.M.  Mother claims the juvenile court erred in failing to find the sibling exception to adoption pursuant to Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(v).  We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In June 2017, the Del Norte County Department of Health and Human Services (Department) filed a section 300 juvenile dependency petition

---

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

concerning six-year-old T.T.M.  The petition alleged Mother, the biological father, and stepfather failed to protect T.T.M. and his biological siblings,[2] failed to provide adequate food, clothing, shelter, or medical treatment, and failed to provide regular care due to substance abuse.

Earlier in June 2017, Mother and T.T.M.'s biological father were pulled over in their vehicle by the California Highway Patrol (CHP) because T.T.M. and his two siblings were not in seat belts.  The car smelled "very strongly" of marijuana.  Because the backseat had been removed, the children were sitting on the floorboards.  There were also two dogs in the car and it was full of belongings.  The children were dirty and appeared to be living in the car.  The CHP contacted the Department and placed the children in protective custody.  When interviewed, the children said Mother was drinking "sippys" (little bottles of alcohol) and buying drugs.  T.T.M.'s nine-year-old sister reported Mother "was drunk and she hit me," and said Mother "is always drunk."  The children also disclosed the family was staying "in the wooded area behind Safeway" without access to utilities or proper sanitation facilities and that they had to go to the woods to use the bathroom.

Following a detention hearing, T.T.M. and his siblings were detained and placed in foster care.

In the jurisdiction report, the social worker recounted Mother had had over 25 prior referrals for child abuse and neglect, including referrals on two different days shortly before law enforcement stopped the family.  Several of

_____

[2] T.T.M.'s older siblings, his sister, J.M., and his brother, T.D.M., were also dependents in the juvenile court.  They are not involved in this appeal. Although mother filed notices of appeal as to both T.T.M. and T.D.M, the notice of appeal for T.D.M. states it pertains to both boys and identifies the order appealed from as the termination of parental rights on April 10, 2020. Mother's parental rights were terminated as to T.T.M., not T.D.M., at the April 10, 2020 hearing, and only T.T.M. is addressed in her briefs.

the reports that Mother had been drinking and abusing drugs had been substantiated.

The court held a jurisdictional hearing in early July 2017, found that T.T.M. and his siblings came within section 300, subdivision (b), and continued the matter for a dispositional hearing.

In preparation for the hearing, the Department filed a disposition report recommending the court declare the children dependents of the court, remove them from their parents' custody, and order the Department to provide the parents with reunification services. The family, according to the report, struggled maintaining stable and safe housing and had been living in their car or in a tent in the bushes. The children appeared to be living with their parents and Mother's husband. The children had been placed in separate foster homes and all were receiving counseling. T.T.M.'s brother and sister were in their fifth and third foster homes respectively. T.T.M. appeared to have adjusted well to foster care and had minimal behavior issues. The children saw each other during visits with their parents.

The Department had referred the parents to alcohol and substance abuse treatment, mental health counseling, and parenting classes. The Department had, in addition, provided at least five hours of weekly visits. Because the parents continued to talk to the children about the case and their foster homes, despite the court order to the contrary, the Department continued to supervise the visits.

At the dispositional hearing, the parties submitted the matter on the report, after which the court declared the children dependents of the court. It further found by clear and convincing evidence that there was a substantial danger to the children's physical or emotional well-being were they to be returned to their parents' care and ordered them placed in foster care. The

3

court ordered the parents to comply with reunification services and continued the matter for a six-month status review hearing.

The Department, in February 2018, filed its six-month status review report, recommending the children remain in foster care. The children, according to the report, were healthy and remained in separate foster care placements, and saw each other at school and at visits with their parents. As to T.T.M., while he was in counseling to address his anger outbursts and learning how to keep his hands to himself and not physically assault his peers and siblings, his behavior had improved both at home and school.

Mother said she was on the waiting list for drug and alcohol treatment and had been seeing a counselor weekly but provided no verification. She provided only one drug test which was positive for marijuana. Mother believed she did not need services and, if the children were back in her home, everything would be fine.

Though the parents initially visited regularly, after their move to Mendocino County, they cancelled many visits. They had attended less than half of the visits in the past four months.

The Department subsequently filed an addendum report. The social worker reported that in February 2018, Mother's 16-year-old son, Ronald H., told a law enforcement officer Mother had been drinking all day, and when she drinks, "she gets hostile and violent" and "is a 'fighter.' " He stated Mother had escalated a verbal altercation to the point where Ronald felt he had to call law enforcement. A Mendocino social worker confirmed Mother was " 'highly intoxicated' " and "was unable to provide an intelligible statement."

In late February, the court held the six-month review hearing. After finding that returning the children to their parents would create a

substantial risk of detriment to them, the court ordered the children to remain as dependents in foster care, continued reunification services, and set the matter for a 12-month status review hearing.

The Department filed a 12-month status review report. The Department recommended termination of reunification services and that the children remain in foster care. T.T.M. was entering second grade and had fewer behavioral issues in the past year at school. He was now placed with a cousin of his father and still exhibited some behavioral issues, but the family was able to work through them with him.

Mother's situation, as explained in the report, had not improved significantly. While Mother reported she had completed counseling, she had provided no verification. She was attending weekly substance abuse treatment in Fort Bragg, however, she tested positive periodically for alcohol and marijuana. Since February 2018, she had attended 23 of 49 available visits. And despite being warned, Mother continued to tell the children they would be coming home soon.

In September 2018, the court held the 12-month status review hearing at which it took the report into evidence and Mother and the social worker testified. After finding by clear and convincing evidence that returning the children to their parents would place them at a substantial risk of detriment, the court terminated reunification services and continued the matter for a section 366.26 hearing.

Thereafter we denied Mother's writ petition challenging the court's findings and orders. (*C.H. v Superior Court* (Dec. 6, 2018, A155522) [nonpub. opn.].)

In December 2018, the Department filed its assessment report for the section 366.26 hearing. The Department recommended that the court terminate parental rights and select adoption as T.T.M.'s permanent plan. T.T.M.'s sister had been placed in the same home and the Department was recommending adoption for her too. The social worker explained the prospective adoptive family were relatives who had known T.T.M. since birth. T.T.M. had been calling the adoptive mother "mom' and he had a good relationship with the family. The social worker noted, however, "[t]he days following visitation is when the children's behavior seem[s] to spike." Since August, Mother had canceled or failed to show for 15 visits.

The Department requested in February 2019 that the court suspend Mother's visitation because the children's behavior deteriorated after visits, during which Mother encouraged them to be disruptive in their foster homes and at school and, as result, the visits were detrimental to the children's emotional and mental health. The social worker reported that T.T.M.'s behavior at home and at school had escalated after visits with Mother.

In the meantime, Mother filed a request to change prior court orders pursuant to section 388, asking to have her children returned to her because, "It is better for children to be raised by their natural parents."

Following a hearing on the request to suspend visits and Mother's section 388 request, in which the court heard testimony from the social worker, Mother, and Mother's 27-year-old son, Randy G., the court granted the request to suspend visits with Mother and denied her section 388 petition.

The Department subsequently filed an addendum report requesting a 120-day continuance of the section 366.26 hearing to develop appropriate permanent plans for the children. The court continued the hearing.

6

In June 2019, the Department filed an addendum to its assessment report, recommending the court terminate Mother's parental rights and select adoption as T.T.M.'s permanent plan. As reported by the social worker, T.T.M. remained in the placement with the paternal cousins. He was receiving medication and his prospective adoptive parents reported his "behaviors are calming down in the home."

Shortly after this report was filed, the court held a section 366.26 hearing, terminated parental rights, and selected adoption as T.T.M.'s permanent plan.

Mother filed an appeal from the order terminating her parental rights. In November 2019, T.T.M.'s attorney filed a request to change prior court orders to reinstate parental rights because the previous foster parents no longer wanted to adopt T.T.M. On January 7, 2020, we dismissed the appeal as moot. (*In re T.T.M.,* case No. A157763.)

In January 2020, pursuant to section 388, Mother filed another request to change court orders. Mother asked to be reunified with T.T.M. because she claimed she had completed her outpatient substance abuse treatment program and was clean and sober.

The adoption assessment report prepared for the section 366.26 hearing, and filed in March 2020, recommended that the court terminate parental rights and select a permanent plan of adoption for T.T.M. The adoption specialist reported T.T.M. continued to attend weekly counseling and took medication for his attention deficit hyperactive disorder. Since starting medication, the incidents of his physical altercations at school had "greatly reduced." And while his behavior had improved, he still had difficulties with positively engaging with others and controlling his impulses.

T.T.M. had been placed with his prospective adoptive mother since August 28, 2019. Although T.T.M. still required redirection in the home and at school, the potential adoptive mother stated she had seen improvement in the past few months in both settings. The social worker noted a "substantial change" in T.T.M.'s behavior since he had been placed in his new foster home. Overall, he appeared "more stable and calmer in his current home." In his previous placement, T.T.M.'s school called multiple times per week for behavioral issues and disruptions, however, the current foster parent reported that his school called only about once per month for behavioral issues, and in general the teacher could address these issues. The report went on to state that the current foster mother was committed to adopting T.T.M. and understood and was willing to accept the legal and financial responsibilities of adoption.

The adoption specialist noted the current foster parent was fostering T.T.M.'s sister prior to her needing to move to a higher level of out-of-county placement. The foster parent, nonetheless, remained in contact with T.T.M.'s sister through phone calls and in-person visits approximately every three months, due to the distance, thus allowing T.T.M. to have a relationship with his sibling. He was able to share gifts, photos, and care packages with her. Maintaining this sibling relationship appeared to be "vital to [T.T.M.]."

The adoption specialist personally spoke with T.T.M. in January 2020. For the first time since meeting and working with him over the last year, "he stated in a calm, assured manner, 'I want to be adopted.'" When asked why he wanted to be adopted at this time in this home, T.T.M. replied, "'This is a good home for me.'"

Importantly, the adoption specialist noted the potential adoptive mother was committed to the child and committed to sibling contacts between

8

T.T.M. and his sister, as well as having his older brother spend the night at their home approximately three times per month.

Although the potential adoptive mother had been informed she could enter into a formal written agreement to arrange for continuing contact between the birth relatives and T.T.M., she declined to do so, explaining she did not feel a postadoption contract was necessary as she was willing to have "openness with [T.T.M.'s] siblings and birth family members as long as it is safe and appears to be in [T.T.M.'s] best interest."

The adoption specialist concluded that T.T.M. appeared to have "developed a trusting relationship with his potential adoptive [parent] and would benefit from the establishment of a permanent parent/child relationship through adoption." The specialist further observed that T.T.M. appeared to have "substantial emotional ties to his birth family and would benefit from being raised by the potential adoptive parent who had demonstrated a deep desire to support T.T.M.'s siblings bonds [*sic*] so that he can remain connected to his relatives in the naturally occurring family settings when possible."

Following a hearing on April 3 and 6, 2020, in which the court heard testimony from several witnesses, it denied mother's section 388 petition.

Several days later, on April 10, the court held the section 366.26 hearing for T.T.M. The section 366.26 report and attachments were admitted into evidence. Mother's counsel submitted the matter on the report and offered no argument.

Finding by clear and convincing evidence that it was likely T.T.M. would be adopted, the court terminated parental rights and selected adoption as his permanent plan.

## II. DISCUSSION

Mother contends the court erred in selecting adoption as the permanent plan for T.T.M. following the selection and implementation hearing held pursuant to section 366.26, because the sibling relationship exception to adoption applies.

Initially, county counsel argues Mother failed to raise the sibling relationship exception to adoption at any time during the section 366.26 hearing as she submitted the matter on the assessment report. Accordingly, county counsel maintains Mother has forfeited her opportunity to raise this exception in her appeal.

Even though it appears from the record that Mother has forfeited the sibling relationship exception to adoption by failing to raise it in the juvenile court, because the issue is not free from doubt, we will address the merits of Mother's contention.

As explained in *In re Celine R.* (2003) 31 Cal.4th 45 (*Celine R.*), " '[o]nce reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.] 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.] It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.] 'The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful.' " (*Id.* at pp. 52–53.)

"Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.'

10

[Citation.]  The circumstance that the court has terminated reunification services provides 'a sufficient basis for termination of parental rights unless the court finds a compelling reason for determining that termination would be detrimental to the child due to one or more' of specified circumstances.  [Citation.]  The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

"[I]f the child is adoptable . . . adoption is the norm.  Indeed, the court must order adoption and its necessary consequent, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child.  The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.]  At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.]  The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

Here, Mother does not dispute the court's finding that T.T.M. is likely to be adopted but contends that the beneficial sibling relationship exception applies such that her parental rights should not have been terminated.

The beneficial sibling relationship exception applies where the court concludes "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the

11

relationship, including, but not limited to, [(1)] whether the child was raised with a sibling in the same home, [(2)] whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and [(3)] whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) The parent bears the burden in the juvenile court of showing the exception applies. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 949.)

While any sibling relationship necessarily involves two or more siblings, a court considering the exception must focus its analysis on the child being considered for adoption, not the other siblings. (*Celine R., supra,* 31 Cal.4th at p. 54.) "The court is specifically directed to consider the best interests of the adoptive child, not the siblings, and must ultimately determine whether adoption would be detrimental to the adoptive child, not the siblings." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) " 'The author of the legislation adding the sibling relationship exception anticipated that "use of the new exception 'will likely be rare,' " meaning "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption." ' " (*In re D.O.* (2016) 247 Cal.App.4th 166, 174 (*D.O.*).)

Application of the sibling relationship exception requires a two-step analysis. First, the court must determine whether terminating parental rights would substantially interfere with the sibling relationship. (*D.O., supra*, 247 Cal.App.4th at p. 173.) Second, if the court determines termination would substantially interfere with the relationship, it must then " 'weigh the child's best interest in continuing that sibling relationship

12

against the benefit the child would receive by the permanency of adoption.' " (*Id*. at pp. 173–174.)

To the extent Mother challenges "the juvenile court's ultimate determination, we apply the substantial evidence standard to the juvenile court's underlying factual determinations, and the abuse of discretion standard to the court's weighing of competing interests." (*D.O.*, *supra*, 247 Cal.App.4th at p. 174.)

The trial court here found that T.T.M.'s placement was "necessary and appropriate and that the agency has complied with the case plan by making reasonable efforts including whatever steps are necessary to finalize the permanent plan." Mother contends otherwise, arguing that at the time of T.T.M.'s initial removal he had always resided in the same home with his siblings, and after being separated, T.T.M. maintained regular face-to-face contact with his older brother, with occasional overnight visits, regular telephone contact with his sister, and occasional contact with his adult brother. Because T.T.M. shared a close relationship with his siblings, Mother maintains continuity of these relationships with his siblings is "extremely important" to T.T.M.

The role of this court on appeal, however, is not to second-guess the juvenile court's decision or to reweigh the evidence. Instead, we consider whether substantial evidence supports the trial court's ruling that adoption was "necessary and appropriate" and whether the court abused its discretion in weighing the competing interests. We conclude the court did not err in this regard.

The evidence strongly supports that termination of Mother's parental rights would not substantially interfere with the sibling relationship. T.T.M.'s current foster parent understood that maintaining a sibling

relationship was vital to him. The foster mother had been fostering T.T.M.'s sister prior to her needing a higher level of placement. And despite his sister's relocation to an out-of-county placement, the foster parent, nonetheless, remained in contact with her through phone calls and in-person visits approximately every three months. Significantly, the adoption specialist indicated the potential adoptive mother (foster mother) was committed to sibling contacts between T.T.M. and his sister, as well as having his older brother spend the night at their home approximately three times a month. Indeed, T.T.M.'s current foster mother's willingness to maintain his current relationship with his siblings is an important factor in favor of the court's final placement determination.

On appeal, Mother argues that while T.T.M.'s foster mother expressed a willingness to maintain postadoption sibling contact, "this did not provide the juvenile court with sufficient justification to formally terminate the sibling relationship" because there was no "set agreement" guaranteeing sibling visitation would take place following termination of parental rights. Though the adoptive parent's openness to visits may be well intended, Mother asserts there is no enforcement mechanism since the court no longer has jurisdiction over the matter.

Neither statute or nor case law require that the parties enter into an enforceable agreement for visitation as a prerequisite to a court finding that adoption would not cause substantial interference with a sibling relationship. The law does acknowledge that, after being adopted, some adoptive children may benefit from contact, direct or indirect, with birth relatives, including siblings. To this end, Family Code section 8616.5, subdivisions (a) and (b)(1), and 8714, authorize postadoption contact agreements executed between the adoptive parents and the birth parents or parent, or siblings provided the

14

contact is beneficial to the children and the agreements are voluntarily executed. However, at its core, such an open adoption is an agreement between those individuals involved; it is not a mandate by the court.

As to postadoptive sibling contact, section 366.29 also represents another limited exception. It authorizes the court, "[w]ith the consent of the adoptive parent or parents," to include in a final adoption order "provisions for the adoptive parent or parents to facilitate postadoptive sibling contact." (§ 366.29, subd. (a).) The court, however, cannot require the adoptive parents to do so. (*Celine R.*, *supra*, 31 Cal.4th at p. 55.)

Because the adoptive parent in the instant matter was not required to enter into a contact agreement, we reject Mother's assertion that in the absence of such an agreement, termination would interfere with the sibling relationship.

Nor is Mother's reliance on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) persuasive. In *S.B.*, the appellate court reversed the trial court's finding that the beneficial parent-child relationship exception did not apply after concluding the child would be greatly harmed by the loss of the significant positive relationship she shared with her father. The father had complied with every aspect of his case plan, frequently visited his daughter, and was devoted to her. She loved him and wanted to live with him. (*Id.* at p. 295.)

The court distinguished the situation in *S.B.* explaining it is not "analogous to the sibling relationship exception under section 366.26, subdivision (c)(1)(B)(v), in which the court considers future sibling contact and visitation. [Citation.] Unlike the parent-child relationship, sibling relationships enjoy legal recognition after termination of parental rights." (*S.B.*, *supra*, 164 Cal.App.4th at p. 300.)

15

Finally, Mother bore the burden of showing the sibling relationship could not be maintained if her parental rights were terminated. (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at p. 949.) Other than mere speculation that T.T.M.'s second adoptive placement could fail because the first adoptive placement failed due to his disruptive behavior and emotional and mental health issues, Mother points to no evidence to meet her burden to demonstrate a substantial interference with the sibling relationship. On the contrary, as noted by the adoption specialist, in his current foster/adopt placement, she had noticed a "substantial change" in T.T.M.'s behavior; he appeared "more stable and calmer." And, unlike his previous placement where the school called multiple times per week for behavioral issues and disruptions, the current foster parent reported his school called only about once per month for behavioral issues, a significant improvement.

In short, substantial evidence supports the juvenile court's decision to terminate Mother's parental rights because the sibling relationship exception is not implicated.[3]

## III. DISPOSITION

The order is affirmed.

---

[3] Because we have concluded substantial evidence supports the court's determination that terminating parental rights would not substantially interfere with the sibling relationship, we need not address whether the court was required to weigh T.T.M.'s interests in continuing the sibling relationship against the benefit he would receive by the permanency of adoption.

MARGULIES, ACTING P. J.

WE CONCUR:

BANKE, J.

SANCHEZ, J.

A160071
*In re T.D.M.*