Filed 4/11/16; pub. order 5/3/16 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.O., a Person Coming Under the Juvenile Court Law. | D069105 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ11191D) |
| v. | |
| JESSICA A., | |
| Defendant and Appellant, | |
| SCOTT O., | |
| Defendant and Respondent, | |
| JE.O., et al., | |
| Objectors and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Sharon Kalemkiarian, Judge. Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant Jessica A.

Michele Anne Cella, under appointment by the Court of Appeal, for Appellants, minors Je.O., Y.O., and Jo.O.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Kristen Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

Linda Rehm, under appointment by the Court of Appeal, for Respondent Scott O.

Jessica O. (mother) and Scott O. (father) are the parents of D.O., who was one year old when this case began. The mother has three older children (Je.O., Y.O, and Jo.O., who were 11, 10, and nine years old, respectively, when this case began; together, the Siblings) by another father. The juvenile court terminated parental rights as to D.O. and ordered adoption as her permanent plan. On appeal, the mother and the Siblings (together, appellants) contend the juvenile court erred by finding the sibling relationship exception to adoption does not apply.[1] (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(v).)[2] Specifically, they contend the trial court erred when determining whether there would be substantial interference with D.O.'s sibling relationships by improperly considering the caregivers' assurances that sibling visits would continue, instead of by considering the factors specifically enumerated in the statute. We find no error and affirm.

---

[1]    The Siblings do not challenge the juvenile court's handling of their own dependency cases.

[2]    All further statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 31, 2014, the San Diego County Health and Human Services Agency (Agency) filed a petition under section 300, subdivision (b), after D.O.'s mentally ill father committed several acts of domestic violence and the mother failed to take protective action or otherwise cooperate with the Agency. The juvenile court issued a protective custody warrant for D.O. and the Siblings.

After the Agency filed the petitions, the mother absconded with D.O. and Y.O. As of the August 1, 2014 detention hearing, their whereabouts were unknown, and neither parent attended the hearing. The court made a prima facie finding on the petition and ordered D.O. detained out of the parents' custody.

One week later, police located D.O. with the father in a grocery store parking lot when the mother was caught shoplifting. D.O. and Y.O. were detained together in one foster home; their brothers were detained together in another.

In its August 26, 2014 jurisdiction report, the Agency stated the mother's whereabouts were unknown. The father's had also been, until he was arrested about one week earlier. The mother had not visited her children since their removal, and the father was restrained by the court from doing so.

The juvenile court made true findings on the Agency's petitions, declared the children dependents of the court, and ordered them removed from parental custody. The court further ordered that "sibling visitation shall occur." The court set a six-month review hearing, but deferred addressing reunification services for the mother until she made herself available to the Agency.

3

In its February 2015 six-month status review report, the Agency updated the court on the children's placements. D.O. was moved from foster care to her paternal grandmother's home on September 17, 2014. One month later, Y.O. was moved from her initial foster home to her brothers' foster home. Neither of the parents visited D.O. or made themselves available to the Agency during the six-month review period. The Agency recommended the court set a section 366.26 hearing to determine D.O.'s permanent plan. After the juvenile court found there was not a substantial probability D.O. would be returned to her parents' custody within six months, the court terminated their reunification services and set a section 366.26 hearing as to D.O. for July 8, 2015. The Siblings' father continued to receive reunification services, and their dependency case proceeded on a separate track. The court ordered that sibling visits continue.

The Agency's section 366.26 report recommended the juvenile court terminate parental rights and select adoption as D.O.'s permanent plan. Neither parent had visited D.O. "due to their limited contact with the Agency." The report stated D.O. was adoptable and advised that the paternal grandmother was committed to adopting her. D.O. and the Siblings were visiting each other twice per month. The Agency stated, "The caregiver[s] of [D.O.] and the [Siblings] are committed to maintaining the sibling interaction and visitation. Therefore, the sibling exception does not apply."

Meanwhile, the paternal grandmother reported to the Agency that she heard from the mother, who said she was in her first trimester of pregnancy with the father's baby. The paternal grandmother told the mother "she would be 'more than willing without any question' to provide a home for the child."

4

In an addendum report, the Agency advised that a social worker had facilitated a supervised visit between the mother and D.O. During the 20-minute visit, D.O. did not recognize the mother and "appeared independent as she engaged in play individually despite [the mother]'s efforts to engage her." The mother did not maintain contact with the Agency after the visit. The father was incarcerated and had no contact with the Agency or D.O.

The Siblings filed a petition under section 388 to establish their standing at the section 366.26 hearing to assert the sibling relationship exception to adoption. The court granted the petition without objection.

At the section 366.26 hearing, the juvenile court received in evidence certain of the Agency's reports and addenda, and the stipulated testimony of two social workers and the Siblings.

The social workers concluded "there's no interference with the sibling relationship" because the paternal grandmother "is open to facilitating sibling visits and contact, even after adoption." The paternal grandmother "consistent[ly] . . . remained compliant with the social worker and [the] Agency," making D.O. available for visits and compliance checks. The Siblings visited D.O. twice per month, and the paternal grandmother had never been unavailable for a visit. The paternal grandmother had lived with the Siblings (who are not her blood relatives) at one point, and had "demonstrated her capacity and dedication to the maintenance of the sibling contact" by taking in the mother's new baby (whose paternity had not been established) "so the siblings can stay together." Thus, the Agency had "no current concerns with the caregiver's willingness

5

and capacity to continue facilitating sibling visits."  Even if there were interference with the sibling relationship, the Agency opined it would not be detrimental to D.O. "from *her* perspective."  (Italics added.)  The Agency noted D.O. "does not discuss her siblings," and "speaks consistently in regards to [the paternal grandmother]."

The Siblings' stipulated testimony established that they lived with D.O. for approximately the first year of her life, until the children were removed from parental custody.  Once in foster care, they visited at a fast food restaurant that had a playground.  Je.O. stated he "help[ed] [D.O.] play on the playground"; they hugged each other at the beginning and end of the visits; and D.O. told Je.O. at the end of visits that she loves him.  Je.O. acknowledged that "sometimes [D.O.] knows [him] and sometimes she doesn't."  Je.O. wished for weekly visits with D.O., and was comfortable having them at the paternal grandmother's home (having been there once before).  Je.O. would "feel mad and bad" if he did not live with D.O. again; he would "feel bad" if he could not visit her again.

Y.O. said she and D.O. were very close.[3]  Y.O. often acted as D.O.'s caretaker.  During visits, Y.O. played with and helped feed D.O.  Y.O. said, "[D.O.] enjoys herself at the visits because she laughs and smiles.  She reaches for me when she needs help while playing."  Y.O. also stated, "[D.O.] and I love each other.  She runs up to me at the visits and says she loves me every time we see each other.  She and I are still very close, and she calls me 'sissy.'  I miss living with her.  She used to cry at the end of our visits when

---

[3]     The Agency's detention report, filed 14 months earlier, stated "[D.O.] appeared bonded with her older sister [Y.O.]."

we said goodbye, but she has gotten over it. When our visits end, we always hug goodbye and tell each other, 'I love you.' " Y.O. wanted to see D.O. more often and would be sad if they could not live together again; she would be "even more sad" if they could not visit each other anymore. Y.O. acknowledged she did not "know how [D.O.] would feel if she couldn't see [Y.O.] again."

Jo.O. stated in his stipulated testimony that D.O. seemed happy to see the Siblings during visits and said things like " 'Brother' " and " 'Sissy!' " Jo.O. would help D.O. play and "hold her hand a lot." At the end of visits, D.O. seemed sad and would cry a little, and the children would all hug and say they love each other. Jo.O. wished he could see D.O. every day, said he would be "really sad" if he could not, and would be "sad, sad, sad" if he were unable to continue visiting her.

After receiving evidence, the juvenile court heard argument from counsel. The Agency argued D.O. was adoptable and no exceptions to the statutory preference for adoption existed. D.O.'s counsel (who was also her guardian ad litem) joined in the Agency's argument, as did the father. The Siblings and the mother argued that the sibling relationship exception applied. The mother argued that the parent-child beneficial relationship exception also applied.

The juvenile court found D.O. adoptable, found neither of the invoked exceptions to adoption applied, terminated parental rights over D.O., and selected adoption as her permanent plan. The court explained that the sibling relationship exception "really only comes into light . . . if there is a demonstrated interference" with such a relationship. The court found that although there is "*some evidence*" that D.O. feels a sibling bond, there is

7

"*absolutely no evidence* that that bond would be interfered with." (Italics added.) The court based this finding on the following evidence: (1) the paternal grandmother's proven track record of facilitating visits with D.O. and the Siblings (whom the court observed are not related to the paternal grandmother); (2) the fact the paternal grandmother took in the mother's new baby, "who she's not even sure is related to her by blood"; (3) the Siblings' nonrelative caregivers' proven track record of facilitating sibling visits; (4) the maternal grandmother's participation in at least one visit; (5) the fact that neither parent objected to placing D.O. with the paternal grandmother; and (6) the lack of any evidence that the paternal grandmother, the Siblings' caregivers, or the maternal grandmother "would in any way interfere" with the sibling relationship. The court concluded, "So I don't find that there would be substantial interference." The court clarified it was not relying on the existence of a postadoption contact agreement.

## DISCUSSION

Appellants contend the juvenile court "did not conduct the analysis required by" section 366.26, subdivision (c)(1)(B)(v) because the court based its finding of no substantial interference solely on the caregivers' "unenforceable commitment to continue sibling visits" and not on the factors expressly enumerated in the statute. We find no error.

### I. *Overview of the Sibling Relationship Exception*

"At a section 366.26 hearing the court is charged with determining a permanent plan of care for the child." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) The court may order one of three alternatives: adoption, legal guardianship, or long-term foster

8

care.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*); § 366.26, subd. (b)(1)-(5).)  "Adoption, where possible, is the permanent plan preferred by the Legislature."  (*Autumn H.*, at p. 573.)  Adoption necessarily involves termination of the biological parents' legal rights to the child.  (*Id*. at p. 574.)  Once the court determines by clear and convincing evidence that a child is likely to be adopted, the burden shifts to any party opposing adoption to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).  (*In re C.F.* (2011) 193 Cal.App.4th 549, 553; *In re S.B.* (2008) 164 Cal.App.4th 289, 297.)

The "sibling relationship" exception codified in section 366.26, subdivision (c)(1)(B)(v) provides an exception to termination of parental rights when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, [1] whether the child was raised with a sibling in the same home, [2] whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and [3] whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); see *In re Valerie A.* (2007) 152 Cal.App.4th 987, 998.)

Under section 366.26, subdivision (c)(1)(B)(v), the juvenile court "is directed first to determine whether terminating parental rights would substantially interfere with the sibling relationship. . . ."  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-952; see *In re Daisy D*. (2006) 144 Cal.App.4th 287, 293 ["The exception . . . applies only when adoption would result in 'substantial interference with a child's sibling relationship.' "].)

"*If* the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*In re L.Y.L.*, at p. 952, italics added; § 366.26, subd. (c)(1)(B)(v).) The sibling bond exception is evaluated from the perspective of the child who is being considered for adoption, not the perspective of that child's siblings. (See *In re Celine R.* (2003) 31 Cal.4th 45, 54-55.)

"The author of the legislation adding the sibling relationship exception anticipated that 'use of the new exception "will likely be rare," ' meaning 'that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption.' " (*In re Daisy D., supra*, 144 Cal.App.4th at p. 293; see *In re Valerie A., supra*, 152 Cal.App.4th at p. 1014 ["application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount"].)

To the extent appellants contend the juvenile court erroneously construed the factors it was required to consider under section 366.26, subdivision (c)(1)(B)(v), we review the claim de novo. (See *In re A.L.* (2010) 190 Cal.App.4th 75, 78.) To the extent appellants challenge the juvenile court's ultimate determination, we apply the substantial evidence standard to the juvenile court's underlying factual determinations, and the abuse of discretion standard to the court's weighing of competing interests. (See *In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)

II. *Analysis*

Before we address the merits of appellants' contention, we reiterate the rarity with which the sibling relationship exception applies. (See *In re Daisy D., supra*, 144 Cal.App.4th at 293; *In re Valerie A., supra*, 152 Cal.App.4th at p. 1014.) The fact D.O.'s counsel and guardian ad litem argued against the exception's applicability suggests this is not one of those rare instances in which the exception applies. We turn now to the merits.

Appellants' overarching premise—that the juvenile court could consider only those factors expressly enumerated in section 366.26, subdivision (c)(1)(B)(v), and no others— is undermined by the statute's plain language. (See, e.g., *Young v. Gannon* (2002) 97 Cal.App.4th 209, 223 ["The court looks first to the language of the statute; if clear and unambiguous, the court will give effect to its plain meaning."].) Although the statute expressly enumerates three factors, it also provides that the court's analysis should "tak[e] into consideration the nature and extent of the [sibling] relationship, *including, but not limited to*," those expressly enumerated factors. (§ 366.26, subd. (c)(1)(B)(v), italics added; see *In re L.Y.L., supra*, 101 Cal.App.4th at p. 952, fn. 6 ["[A]s the Legislature noted, the list in the statute is not exclusive."].) "The phrase 'including, but not limited to' is a term of enlargement, and signals the Legislature's intent that [a statute] applies to items not specifically listed in the provision." (*Major v. Silna* (2005) 134 Cal.App.4th 1485, 1495; see *People v. Arias* (2008) 45 Cal.4th 169, 181 ["the proviso 'including, but not limited to' 'connotes an illustrative listing, one purposefully capable of enlargement' "]; *In re M.W.* (2008) 169 Cal.App.4th 1, 5-6 ["use of the term 'including,

11

but not limited to' . . . suggests a legislative intention to allow broad discretion"].)  Thus, the plain language of section 366.26, subd. (c)(1)(B)(v) authorized the juvenile court to consider factors other than those expressly articulated in the statute—such as a proven history of, and expressed commitment to, sibling visits.

Appellants argue by analogy that because a juvenile court cannot rely on an unenforceable promise of future visitation when deciding whether the parent-child beneficial relationship exception applies (see *In re C.B.* (2010) 190 Cal.App.4th 102, 128-129), the court likewise cannot consider promises of future visitation when deciding whether the sibling relationship exception applies.  The analogy is inapt.  (See *In re S.B., supra*, 164 Cal.App.4th at p. 300.)  Freeing a child for adoption necessarily requires terminating—that is, substantially interfering with—the parent-child relationship.  (See *In re Autumn H., supra*, 27 Cal.App.4th at p. 574.)  But "[u]nlike the parent-child relationship, sibling relationships enjoy legal recognition after termination of parental rights." (*In re S.B., supra*, 164 Cal.App.4th at p. 300.)[4]  Thus, it is not a foregone conclusion that terminating parental rights will substantially interfere with a sibling relationship, and the juvenile court must make this factual determination.

The Agency cites several cases that indicate assurances of continued sibling visits are relevant to this determination.  (See *In re L.Y.L., supra*, 101 Cal.App.4th at pp. 951-

---

[4]     Consistent with this distinction, the subdivision that sets forth the parent-child beneficial relationship exception does not require the juvenile court to determine whether there will be substantial interference with the relationship, whereas the subdivision setting forth the sibling relationship exception does.  (Compare § 366.26, subd. (c)(1)(B)(i) with § 366.26, subd. (c)(1)(B)(v).)

952; *In re Daisy D., supra*, 144 Cal.App.4th at p. 293; *In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1422; *In re Valerie A., supra*, 152 Cal.App.4th at p. 1014; *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1019.) We find these cases persuasive. We acknowledge that the juvenile courts in the cited cases did not rely *exclusively* on evidence regarding sibling visits, but also considered (to varying degrees) the factors enumerated in section 366.26, subdivision (c)(1)(B)(v). Given the potential tenuousness of future sibling visits, it is the better practice for juvenile courts to also consider the expressly enumerated factors. However, we conclude it was not error to depart from that practice here, where the record contains substantial evidence that would have allowed the juvenile court to otherwise reach the same conclusion by considering the expressly enumerated factors.

Although appellants frame their challenge primarily as a legal one directed at the propriety of considering future sibling visits at all, they also assert that "no evidence supported the juvenile court's finding that the sibling relationship would remain intact, except for speculation that the caregivers would continue to allow it." This argument ignores that it was *appellants' burden* to establish there would be substantial interference, not the Agency's burden to establish there would not. The juvenile court found there was "*absolutely no evidence* that the bond would be interfered with." (Italics added.) Thus, *appellants*' unsubstantiated assertion on appeal that "many things can happen over the next 16 years" is *speculative*. (See, e.g., *In re Daisy D., supra*, 144 Cal.App.4th at p. 293 ["it was anticipated that the minor would be adopted by her paternal grandparents, who intended to maintain contact between the minor and her half siblings. Appellant's assertion that animosity between her and the paternal grandparents would lead to a

13

cessation of sibling visits after the adoption is speculative and unsupported by the record."]; *In re Jacob S., supra*, 104 Cal.App.4th at p. 1019 ["The grandparents have said they . . . are open to maintaining ties between [the adoptive children] and their siblings. The grandparents have done so thus far, and there is no evidence they intend to stop once they have adopted [the adoptive children]."]; *In re Salvador M., supra*, 133 Cal.App.4th at p. 1422 ["there is nothing in this record to suggest that the brothers' relationship would be terminated, as both [the mother] and the grandmother have indicated they recognize the value of the sibling relationship"].)

In any event, the juvenile court cited five evidentiary bases (discussed above) supporting its conclusion. Notably, the court did not rely solely on unsupported assurances from the caregivers that they would allow future visits; rather, the court cited the caregivers' proven track record of facilitating visits, and the paternal grandmother's commitment to the mother's new baby (who is related to D.O. but may not be related to the paternal grandmother). The court did not err.

Even if the juvenile court erred in determining there would be no substantial interference with the sibling relationship, the error would not be prejudicial because it does not appear reasonably probable appellants would have obtained a more favorable result absent the error. (See *In re Jonathan B*. (1992) 5 Cal.App.4th 873, 876; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Appellants cite the Siblings' stipulated testimony and the juvenile court's finding that there was "some evidence" that D.O. feels a sibling

14

bond.[5]  At most, this establishes the existence of a sibling relationship;[6] it says nothing about the detriment, if any, D.O. would suffer if that relationship were substantially interfered with, or whether that detriment would outweigh the benefits to D.O. of the stability and permanence of adoption.  In the case of a two-year-old dependent who spent only the first year of her life with her siblings and then visited them only twice each month during the second year, we find it is not reasonably probable that the juvenile court would have resolved that balancing test in the Siblings' favor.  (See, e.g., *In re Daisy D., supra*, 144 Cal.App.4th at p. 293 [finding no prejudice where "the minor was just over one and one-half years old when she was placed separately from her half siblings in the home of the paternal grandparents.  In the ensuing two years, the minor had visits with her half siblings between two and four times a month.  And although the minor clearly enjoyed the time she spent with her half siblings, there was no evidence that the detriment she might suffer if visits ceased presented a sufficiently compelling reason to forgo the stability and permanence of adoption by caretakers to whom she was closely bonded."].)

---

5      Although the focus of the sibling relationship exception is the impact on the adoptive child and not her siblings (see *In re Celine R., supra*, 31 Cal.4th at pp. 54-55), "evidence of the [siblings'] relationship with the child . . . might be relevant as indirect evidence of the effect the adoption may have on the adoptive child" (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 823).

6      Although substantial evidence supports the juvenile court's finding of a sibling bond, the record suggests the bond may not have been a strong one.  Je.O. acknowledged that "sometimes [D.O.] knows [him] and sometimes she doesn't."  Y.O. acknowledged that D.O. used to cry at the end of visits but has "gotten over it," and that she (Y.O.) does not "know how [D.O.] would feel if [D.O.] couldn't see [Y.O.] again."

DISPOSITION

The order is affirmed.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


McDONALD, J.

16

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.O., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D069105 |
| Plaintiff and Respondent, | (Super. Ct. No. SJ11191D) |
| v. | |
| JESSICA A., | |
| Defendant and Appellant, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| SCOTT O., | |
| Defendant and Appellant, | |
| JE.O., et al., | |
| Objectors and Appellants. | |

THE COURT:

The opinion in this case filed April 11, 2016, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

HALLER, Acting P. J.

Copies to:  All parties

2