Filed 9/4/24; Certified for Publication 9/9/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re V.S., a Person Coming Under the Juvenile Court Law. | B332310 consolidated with B334112 <br><br> (Los Angeles County Super. Ct. Nos. DK22355, DK22355B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>     Plaintiff and Appellant; <br><br>     v. <br><br> V.S., a Minor, <br><br>     Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Tiana J. Murillo, Judge. Reversed with instructions.

Aida Aslanian, under appointment by the Court of Appeal, for Appellant Minor.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Peter Ferrera, Deputy County Counsel, for Plaintiff and Appellant.

---

## INTRODUCTION

At birth, V. was removed from the care of her mother, Vanessa S. (mother). V.'s half-brother, N., nine years old at the time, was also removed from mother. For the first four months of V.'s life, she and N. were placed together in the care of a relative; N. was then moved to the custody of his non-offending father. V. was placed with her current caregiver, an aunt, at the age of nine months. The aunt was deemed V.'s legal guardian in 2019. N. was returned to mother's custody after his father encountered some health problems. N. and V. saw each other sporadically during V.'s visits with her mother and grandmother.

The aunt moved to adopt V. in 2022. Mother opposed termination of parental rights under the parental relationship exception to adoption under Welfare and Institutions Code, section 366.26, subdivision (c)(1)(B)(i).[1] The juvenile court held that mother did not meet her burden to demonstrate that this exception applied. The court then, without request or input from the parties, held that adoption would not be in V.'s best interest under the sibling exception to adoption in section 366.26, subdivision (c)(1)(B)(v). The court selected legal guardianship as the permanent plan for V. The Los Angeles County Department

---

[1] All undesignated section references are to the Welfare and Institutions Code.

of Children and Family Services (DCFS) and V. both appealed. No party has filed a respondent's brief.

We reverse. Adoption is the clear preference under the law. The exceptions in section 366.26 apply only under limited circumstances, and the party opposing termination of parental rights has the burden to demonstrate that an exception applies. The juvenile court abused its discretion by applying the wrong legal standards, and by relieving mother of her burden to prove that an exception applies. In addition, substantial evidence does not support a finding that the sibling exception applies in this case.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Detention (2017) through legal guardianship (2019)

V. and N. came to the attention of DCFS at the time of V.'s birth in March 2017, after mother tested positive for amphetamines and opiates; V. tested positive for methamphetamines. Mother reported that V.'s father was violent and a drug abuser. V.'s father died in May 2019 and is not at issue in this appeal. N., who had a different father, was nine years old at the time of V.'s birth.

The children were detained from mother and placed in the care of a maternal great-aunt, S.G. DCFS filed a petition under section 300, subdivision (a) and former subdivision (b)(1) alleging that mother's drug abuse and domestic violence between mother and V.'s father subjected the children to a risk of harm. The

---

[2] Because the focus of this case is on the sibling relationship, we summarize the facts relevant to that relationship, taking care to note instances in the record that reference V.'s interactions with N.

3

juvenile court found the allegations in the petition true under section 300, former subdivision (b)(1) on June 2, 2017.

N.'s father and mother had a previous family court order for shared custody of and visitation for N. At the June 2, 2017 adjudication hearing, the juvenile court ordered that N. resume regular visitation with his father, a nonoffending parent, as a transition to N. being placed with his father. At the disposition hearing on August 1, 2017, the juvenile court ordered that N. be released to his father but maintained jurisdiction over N.

A status review report filed on January 26, 2018 stated that N. lived with his father and V. remained with S.G. N. and V. had visits with each other at S.G.'s house, and mother visited the children together at S.G.'s house. Mother did not have a stable home and was staying on friends' couches or in motels. Mother and V.'s father had been in another physical altercation, and mother was not in compliance with court-ordered services regarding domestic violence education.

S.G. told DCFS that due to a physical ailment, S.G. might not be able to continue caring for V. DCFS recommended that reunification services be terminated for mother, and that a permanent plan of adoption be put into place for V.

An interim review report filed on April 6, 2018 stated that N. remained with his father, and V., now one year old, had been moved to the home of another maternal great-aunt, C.L. Mother had been arrested for the attempted murder of V.'s father after attacking him with a knife; she was incarcerated. On April 6, 2018, the juvenile court terminated reunification services for mother and set a permanency planning hearing for V. under section 366.26. For N., the juvenile court terminated jurisdiction

and issued an exit order assigning sole legal and physical custody to N.'s father.

The section 366.26 report filed on July 24, 2018 related to V. only. It stated that V. was doing well in the home of C.L. and the L. family. V. was happy, well-adjusted, and well bonded to C.L., her husband, and the couple's biological children, ages 21, 19, and 17. DCFS noted that V. "maintains ongoing contact with her half-sibling [N.]. The [children's maternal grandmother (grandmother)] helps facilitate contact between [V.] and [N.] in order to allow the child to preserve a sibling bond." DCFS stated that the permanent plan for V. was legal guardianship with C.L.[3] Mother was still incarcerated—she had been sentenced to three years for assault with a deadly weapon—but she remained in contact with V. through phone calls and by sending V. letters and drawings.

Status review reports filed on September 13, 2018 and May 9, 2019 stated that V. remained with the L. family and was thriving. The L. family continued to be willing to be V.'s legal guardians, and stated that they hoped someday mother would be able to parent V. DCFS noted that grandmother took V. and N. to visit mother at her place of incarceration in August 2018. No other visits with N. were noted. DCFS stated that there was "no reason the child has an exception that prevents her from achieving permanency to include both adoption or legal guardianship."

---

[3] Grandmother expressed an interest in adopting V., and DCFS stated that adoption with grandmother was a possible permanent plan for V. Grandmother's approval was delayed due to a criminal conviction, however, and grandmother withdrew her request to adopt V. in February 2019.

At the section 366.26 hearing on May 9, 2019 and in a written order on May 23, 2019, the juvenile court found legal guardianship to be the permanent plan, and terminated jurisdiction over V. The court ordered that mother's visits with V. were subject to the approval of C.L., and were to be monitored.

Mother was released from prison in May 2019, and discharged from parole in November 2019.

**B.    Section 388 petitions**

In November 2022, mother filed a petition under section 388 seeking custody of V. Mother stated that she had her own apartment, she now had custody of 14-year-old N.,[4] and she also wanted custody of V., starting with unmonitored and overnight visits to transition V. into her care. Mother stated in her petition that V. "loves her brother and she should be raised with him."

C.L. objected to mother having overnight visits or transitioning custody to mother. C.L. asserted that V., now five years old, had been in the same home for more than four years, she was stable and thriving, and "[a]t this point, it would be traumatic for [V.] to be moved from the only home she has ever known." C.L. noted that mother only visited V. sporadically, arranging visits and then not showing up, and she only called

---

[4]    N.'s father became unable to care for N. when he encountered some health problems; N.'s father was paralyzed and used a wheelchair, and he nearly had a foot amputated. A child neglect referral from March 2021 stated that N.'s father had left N. in the care of S.G. and grandmother, and he was "aghast" upon learning that N. was living with mother unsupervised, in violation of the family court order that mother's visits be supervised. Mother and N.'s father came to an agreement, and a family court order was entered granting mother primary custody of N.

6

once every few weeks. Because mother had not made a serious effort to reunify with V. upon her release from prison, C.L. and her husband now wanted to adopt V. C.L. noted that V. was "close with" grandmother and N.

Mother blamed the sporadic visitation on "restrictions" imposed by C.L., and said it was easier to visit with V. at grandmother's house. Grandmother said she had overnight visits with V. every other weekend, and during these visits mother would stop by about once a month for a few hours. Grandmother said that V. was not very close with mother. Grandmother noted that N. also sometimes joined the visits. The juvenile court set a hearing on mother's section 388 petition for March 6, 2023.

On February 3, 2023, C.L. filed a section 388 petition seeking to adopt V. C.L. stated that V. had lived in the same home since she was nine months old, she was stable and thriving, moving her would be traumatic, and mother had not made a serious effort to reunify with her. The court set a hearing for both 388 petitions to be heard together.

In a March 3, 2023 response to C.L.'s section 388 petition, DCFS noted that V. had never been in mother's custody, and she had been in C.L.'s care since February 2018. DCFS stated that mother continued to visit only inconsistently, and that unmonitored visitation was not in V.'s best interest. V. and N. had a visit together with grandmother and mother the weekend of February 4, 2023. On February 23, 2023, V. had a video visit and "spoke briefly to her mother; but, [V.'s] conversation with her brother was much longer." DCFS recommended that mother's section 388 petition be denied, that C.L.'s petition be granted, and that jurisdiction be reinstated for the purpose of adoptive planning.

At the hearing on both section 388 petitions on March 14, 2023, mother submitted an unsigned, handwritten letter apparently from N., addressed to "Your Honor," dated January 30, 2023. The letter stated that N. enjoys living with mother, but "its not fair that [C.L.] doesnt invite us over to partys or events that my sister has at school. . . . My sister loves me and my mom and my dog. . . . its hard for my mom to build a bond with my sister because dont let my mom take [V.] anywhere or include us. . . . I feel like it would be a blessing if my sister could come over more often and even spend the night on weekends. My mom got me back so please give my mom a chance to get [V.] back. She will be loved by both of us. Thank you. [*Sic*.]" Mother also submitted photos, many of which included V. and N. together.

Mother's counsel argued that mother's section 388 petition should be granted, asserting that nothing in the record suggested that it would be detrimental to V. to transition back into mother's care. V.'s counsel argued that C.L.'s petition should be granted, stating that although legal guardianship was the plan in 2019 before mother was released from prison, mother had not made serious attempts to reunify with V., and at this point it would be detrimental to move V. out of the only home she could remember. V.'s counsel stated that C.L. "will continue to allow mother to have visitation." DCFS's counsel also recommended that C.L.'s section 388 petition be granted.

The juvenile court found that it would not be in V.'s best interest to attempt further reunification with mother. The court denied mother's section 388 petition, granted C.L.'s section 388 petition, and reopened jurisdiction for purposes of setting a section 366.26 hearing. The court also ordered that mother's visitation be increased.

**C.    Section 366.26 determination**

In a last-minute information filed on May 5, 2023, DCFS noted that C.L. reported that V. "has been experiencing nightmares and bedwetting in response to increased contact by mother." There were descriptions of several of mother's visits; none mentioned the presence of N.

At a status hearing on May 15, 2023, mother orally requested unmonitored visitation. DCFS and V. objected, stating that nothing in the record supported a finding that unmonitored visitation was in V.'s best interests. The juvenile court granted mother's request to have unmonitored visitation, stating that "mom is the bio mom of the child" and "the department has not identified a safety risk." The court also stated that "mother gave life to this child, and I recognize that the caregivers have been doing a good job of caring for the child, but I have to be able to assess . . . whether or not there is a bond between the child and her bio mother, and I cannot do that unless there are unmonitored visits."[5]

---

[5]    The court's reasoning is not supported by law or the record. Mother never reunified with V., and the juvenile court set section 366.26 hearings first in April 2018 and then in March 2023. "[W]hen the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) At that point, visitation orders must be based on the best interests of the child—not to support mother's legal arguments about parental bonding or for ease of the court's decisionmaking. (See, e.g., *In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122-1123 [after family reunification services have been terminated, the juvenile court's overriding concern is the child's best interests].)

9

The section 366.26 report filed on June 29, 2023 stated that V., age 6, remained in C.L.'s care. Mother's visits were "sporadic." Grandmother "maintains DCFS authorized unmonitored contact, and as a result, [V.] has preserved a strong emotional bond and attachment [with grandmother]. Further, [grandmother] facilitates ongoing contact between [V.] and her half-sibling [N.], in order to allow the children to preserve a sibling bond." DCFS reported that there were "no barriers to adoption at this time" and "Mr. and Mrs. L are extremely committed to adopting" V. DCFS also stated, "The Department continues to support Mr. and Mrs. L.'s decision to adopt [V.]. Mr. and Mrs. L. are the parents of three adult children and [V.] became a part of the family unit. Mr. and Mrs. L. have facilitated, and likely will continue to facilitate, contact between [V.] and members of her maternal/paternal family, including a biological mother and half-sibling. Overall, [V.] has been well taken care of by Mr. and Mrs. L. Mr. and Mrs. L. is the only home that [V.] has ever known and she is well established."

DCFS included a list describing visits from January to June 2023, which was provided by the L.s. The list noted the video call in which V. spoke with N. on February 23, and that there was a party in a park for N. and V. on March 25, during which V. played with N. N. was not otherwise noted as being present during any visits. A last-minute information filed on July 12, 2023 described V.'s monitored visits with mother from May 25 to July 12, 2023. None of the descriptions stated that N. was present. A last-minute information filed on July 13, 2023 included a description of an email from C.L. stating that V. did not want to visit mother at her apartment anymore, because V.

was uncomfortable with the dog excrement and roaches in the home, and mother "cussing at" N.

An updated section 366.26 report filed on August 7, 2023 noted again that V. "and her half-sibling [N.], appear to have a sibling bond and [V.] spends time with [N.] during visits with" grandmother. DCFS also noted that grandmother's visitation with V. remained regular, and V. "has preserved a strong emotional bond and attachment" with grandmother, but mother's relationship with grandmother was "strained." DCFS again stated that there were no barriers to adoption. On August 2, 2023, a social worker spoke with N. about V.'s visits. N. reported that V. "has different demeanors at times she is shy, timid and to herself; only wanting to be on her iPad. [N.] stated [V.] also enjoys spending time with him and is often clingy where she says 'brrooooother' and sits near him throughout the visit." N. said he enjoys visits with V., and he hoped to be a "positive influence" in her life. DCFS reported that mother wanted overnight visits, but C.L. reported that V. does not like to visit mother's apartment. V. was not comfortable speaking with the social worker alone and did not provide information on the subject.

DCFS stated that "it does not appear that [V.] will be affected if visits with [mother] are terminated," and, "It does not appear that severing the relationship between [V.] and [mother] would cause [V.] emotional instability." DCFS stated that "[a]doption would create a greater sense of stability for" V., while a "permanent plan less than adoption may be harmful for" her. DCFS noted that N. said "that [V.] is sometimes *clingy* and will sit with him for the duration of the visit." DCFS concluded, "Considering all of the above factors, . . . it would not be

11

detrimental to [V.] to terminate the parental rights of [mother]. The benefits and security of the adoptive home with legal guardians Mr. and Ms. L[.] outweigh[ ] any detriment to [V.]."

Caregiver information forms from C.L. and her husband included letters to the court. They stated that V. was happy and stable in their home, the only home V. had known, and asked that V.'s stability not be disrupted. Mr. L. also noted in his letter that V. "has always been aware of her extended family, (her Mother [ ] and her Aunt and Grandmother on her now deceased Father's side of her family)." A visit log by the L.s through August 1, 2023 noted that N. was present at visits on July 1 and 9.

A last-minute information filed on August 18, 2023 included a visitation log written by mother. The log consists of three photographs of a calendar book with handwritten notes. The handwriting is difficult to read in the photocopies in the record. The entries appear to state mostly times and places; none of the visits appears to mention N.

The section 366.26 hearing was held on August 21, 2023; mother testified. When asked what "negative consequences" V, might experience from the termination of parental rights, mother said that V. "might blame [the L.s] for taking her away from me and her brother." When asked about V. and N.'s relationship, mother said, "She loves her brother. Every time she sees him she's like 'brother.' She gets all happy and runs and gives him a hug. She likes to play with him. She feels really comfortable with him." Mother said she did not want her parental rights terminated because the L.s always made it hard for mother to visit with V., and legal guardianship would be better for V. "[b]ecause maybe eventually I could get her back and be close to

her." Mother agreed that she saw V. on birthdays and holidays with grandmother.

The court asked mother's counsel if she was going to argue that an exception to the termination of parental rights was going to apply; mother's counsel said yes. The court ordered the parties to "submit your argument on the exceptions that you believe apply today in writing."

In mother's written briefing, she argued that the parental relationship exception applied under section 366.26, subdivision (c)(1)(B)(i) and *Caden C., supra*, 11 Cal.5th 614. Other than noting mother's visitation with V. and N. in 2018, the brief did not mention N. or V.'s relationship with N. In V.'s and DCFS's written briefing, they argued that mother did not meet the *Caden C.* factors, and asked that parental rights be terminated. These briefs also did not discuss V.'s relationship with N. or the sibling exception to adoption.

At the continued section 366.26 hearing on September 13, 2023, the court noted that mother asserted that the parental relationship exception applied. The court summarized the basic timeline of the case, and stated, "So there are two possible exceptions that could apply here. Parental bond and sibling bond." The court noted that mother had the burden to prove all three *Caden C.* factors, but she did not. The court therefore found that the parental relationship exception did not apply.

The court continued, "It is my duty, however, given the weight of terminating a parent's rights and given the totality of these circumstances and the entire record that I reviewed, to determine whether any other exception applies here. Which leads me to the sibling bond exception. [¶] Case law indicates an analysis parallel to the parental bond exception. And the

13

question is whether adoption would pose a substantial interference with this child's sibling relationship to conclude that an adoption would be detrimental to [V.]." The court noted that section 366.26, subdivision (c)(1)(B)(v) requires that a court consider "the nature and extent of the relationship between the siblings, whether ongoing contact would be in their best interest, among other things."

The court noted that in 2018 N. said he wanted to reunify with mother and V., and that "these children shared the significant and likely traumatic common experience of being removed from their biological mother." The court noted that grandmother facilitated contact between N. and V. to preserve the sibling bond. The court further noted that in the recent reports, DCFS noted that N. and V. had a sibling bond, and that N. said he enjoyed being with V. and he wanted to be a positive role model for her. The court continued, "I'm required to evaluate whether ongoing contact with her sibling would be in the child's best interest. And in light of these facts and all of the facts taken together, even while I did not find a parental bond here, I find it would be detrimental to [V.] to order adoption because I find it would be in her best interest to have ongoing contact with her sibling. [¶] If I order adoption, it cannot be conditional as a matter of law. It is effectively a legal order that erases her mother from her life and by extension, the brother to whom she is bonded, based on this record, as far as I could tell. [¶] I recognize that the caregivers may represent that they're willing to facilitate ongoing contact. But they know and I know that I cannot legally require that. I cannot do it."

The court also noted that V. "is at an age that she cannot legally consent to the erasure of the relationship with her mother

14

and her brother." The court stated, "I do not find on this record that the benefit of adoption would outweigh the harm of severing this child's only sibling relationship." The court noted that it was "tracking" the *Caden C.* prongs and "I'm reaching the third prong where the court is having to make some inference based on the future weighing, I can't help but wonder how future family holidays might look here if I order adoption or [*sic*] the child's only sibling was with mom." The court said these were "[t]he kinds of situations that might arise where a child is aware of these family relationships, but cannot possibly understand the legal ramifications of them or how they impact how other family members may interact with her. [¶] So given all of this information, I find that the sibling bond exception applies to adoption. and because it applies, I am not ordering adoption today." The court stated in its minute order, "The Court finds the parental bond exception does not apply in this case. [¶] The Court finds the sibling bond exception applies in this case. The Court further finds adoption to be detrimental to the minor. Maintaining the sibling bond is found to be in the best interest of the minor. [¶] Adoption is not ordered."

DCFS and V. timely appealed.

**D.    Review hearing**

According to an interim review report filed on October 3, 2023, C.L. said that V.'s visitation with N. was sporadic; of 73 visits with mother, N. was present for 11 of them. C.L. felt that V. maintaining a bond with N. was important, but it should not outweigh the security and stability V. deserved by way of adoption. C.L. also noted that V. had developed a sibling bond with C.L.'s three children. C.L. stated that the high frequency of V.'s scheduled visitation with mother limited V.'s ability to finish

her homework and participate in extracurricular activities. DCFS again found no barriers to adoption, and stated, "the Department continues to believe that adoption by Mr. and Mrs. L.'s [*sic*] is the best permanent plan."

At the review hearing on October 25, 2023, the court stated, "I've read the Department's report. I'm not clear on the recommendation. I understand that despite the court's order, Department is asking me to order adoption as the permanent plan, which I'm not doing." DCFS confirmed that its recommendation would continue to be adoption until the pending appeal was complete. Mother's counsel requested unmonitored, overnight visits. The court stated that it was not going to change any orders, and would maintain the status quo.

V. timely appealed the court's order. We granted V.'s motion to consolidate the two appeals.

## DISCUSSION

DCFS and V. (collectively, appellants) argue that the juvenile court erred by applying the sibling exception under section 366.26, subdivision (c)(1)(B)(v). Appellants contend the court's actions were procedurally improper because the court undermined requirements about burden of proof. In addition, appellants assert that the court's finding that the sibling exception applied is not supported by substantial evidence. No party has appeared as a respondent.

"To the extent appellants contend the juvenile court erroneously construed the factors it was required to consider under section 366.26, subdivision (c)(1)(B)(v), we review the claim de novo. [Citation.] To the extent appellants challenge the juvenile court's ultimate determination, we apply the substantial evidence standard to the juvenile court's underlying factual

16

determinations, and the abuse of discretion standard to the court's weighing of competing interests." (*In re D.O.* (2016) 247 Cal.App.4th 166, 174.)

## A. Legal standards

Children have "compelling rights . . . to have a placement that is stable, permanent, and . . . allows the caretaker to make a full emotional commitment to the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time." (*Id.* at p. 307.) "[W]here possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker." [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child."' (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Thus, once the trial court finds at a section 366.26 hearing that "it is likely the child will be adopted," "the court shall terminate parental rights unless" one of the statutory exceptions applies. (§ 366.26, subd. (c)(1).) To find that an exception applies, the court must find "a compelling reason for determining the termination would be detrimental to the child." (*Id.*, subd. (c)(1)(B).) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R., supra*, 31 Cal.4th at p. 53 (emphasis in original).)

17

One of the statutory exceptions is the sibling relationship exception in section 366.26, subdivision (c)(1)(B)(v). That subdivision states that a court may find that termination would be detrimental to the child if "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."

**B.** **The juvenile court's sua sponte application of the sibling exception without notice**

Appellants contend the juvenile court abused its discretion by finding that the sibling relationship exception applied, even though no party had asserted it. We agree.

The court asserted that it was "required" to consider the sibling relationship exception to adoption. This was incorrect. "[N]othing in the legislative history nor in the language of the statute itself requires that the juvenile court give sua sponte consideration to the sibling relationship exception when no party has argued it applies." (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 292.)

The court's sua sponte assertion of the sibling relationship exception undermined the statutory burdens placed upon the parties. "The party claiming that termination of parental rights would be detrimental to the child has the burden of proving the detriment." (Cal. Rules of Court, Rule 5.725(d)(2).) Here, mother was the only party opposed to terminating parental rights, and

therefore mother had the burden of demonstrating that one of the exceptions in section 366.26 applied. "The parent has the burden of establishing an exception to termination of parental rights." (*In re Daisy D.*, *supra*, 144 Cal.App.4th at p. 291; see also *Caden C., supra*, 11 Cal.5th at p. 630-631 ["if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan"]; *In re Valerie A.* (2006) 139 Cal.App.4th 1519, 1523 ["The parent bears the burden of proving both the existence of the sibling relationship and that its severance would be detrimental to the child"]; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 ["To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child"].) The burden on the parent is a heavy one. (See, e.g., *In re Celine R.*, *supra*, 31 Cal.4th at p. 61 ["the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption'"].)

The juvenile court erred by relieving mother of the burden to show that a section 366.26 exception applied. Mother did not assert that the sibling relationship exception applied, and as discussed more fully below, it would have been impossible for mother to meet that burden on this record. Application of the wrong burden of proof constitutes an abuse of discretion. (See *In re L.S.* (2014) 230 Cal.App.4th 1183, 1194 ["the discretion of the juvenile court is limited by the statutory framework of dependency jurisdiction," and application of the wrong burden of proof is an abuse of discretion]; *In re Tamika C.* (2005) 131

19

Cal.App.4th 1153, 1168 ["applying the wrong burden of proof" constituted an abuse of discretion].)

The court also erred in applying the *Caden C.* factors to the sibling relationship exception rather than relying on the language of section 366.26, subdivision (c)(1)(B)(v). The *Caden C.* factors are specifically tied to the language of section 366.26, subdivision (c)(1)(B)(i), describing the parental relationship exception. The *Caden C.* court made clear that it was not considering how other section 366.26 exceptions should be assessed: "We don't address here what it means for termination to be detrimental due to any of the other listed exceptions. That inquiry may well differ depending on the particular exception at issue. (See § 366.26, subd. (c)(1)(B)(ii)–(vi).)" (*Caden C., supra*, 11 Cal.5th at p. 634.) *Caden C.*'s interpretation of subdivision (c)(1)(B)(i) is therefore not applicable to the interpretation of subdivision (c)(1)(B)(v).

## C. Substantial evidence does not support the juvenile court's order

Appellants further contend that the juvenile court's findings are not supported by substantial evidence. We agree.

As stated above, the sibling relationship exception in section 366.26, subdivision (c)(1)(B)(v) applies if "[t]here would be substantial interference with a child's sibling relationship," taking into account "the nature and extent of the relationship," whether the children were raised together in the same home, whether the children share "significant common experiences" or an "existing close and strong bond[ ]," and "whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."

"[T]he language focuses exclusively on the benefits and burdens to the adoptive child, not the other siblings." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) Application of the sibling relationship exception is "rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014; see also *In re L.Y.L., supra,* 101 Cal.App.4th at p. 950 [the author of the bill adding the sibling exception noted "that use of the new exception 'will likely be rare'"]; *In re D.O., supra*, 247 Cal.App.4th at p. 174 ["we reiterate the rarity with which the sibling relationship exception applies"].)

Substantial evidence does not support a finding that this case presents one of the rare instances in which the sibling relationship is strong enough to outweigh the stability and permanency of adoption for V. (See, e.g., *In re D.O., supra*, 247 Cal.App.4th at p. 174 ["The fact D.O.'s counsel and guardian ad litem argued against the exception's applicability suggests this is not one of those rare instances in which the exception applies"].) N. is nine years older than V., and they lived together only for the first four months of V.'s life. Although they visited each other and enjoyed each other's company, the visits were sporadic. Their shared experiences were limited. V., a six-year-old at the time of the section 366.26 hearing, did not have experiences similar to those of N., a 15-year-old high-school student. The juvenile court said the children "shared the significant and likely traumatic common experience of being removed from their biological mother." However, V. was removed at birth and was living in the only home she could remember; her experiences

were not similar to N.'s, who had lived with multiple family members throughout his life.

The juvenile court also erroneously assumed that V. and N. would never see each other again. The court relied on *Caden C., supra*, 11 Cal.5th at p. 633, in which the Supreme Court stated, "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." While terminating parental rights necessarily interferes with a parental relationship, the same is not true for a sibling relationship. Thus, section 366.26, subdivision (c)(1)(B)(v) requires the court to make a factual finding about whether "[t]here would be substantial interference with a child's sibling relationship." In addition, the law allows a court to consider and facilitate "postadoptive sibling contact" through voluntary contracts. (§ 366.29.) Thus, "it is not a foregone conclusion that terminating parental rights will substantially interfere with a sibling relationship, and the juvenile court must make this factual determination." (*In re D.O., supra*, 247 Cal.App.4th at p. 175.) The court erred by failing to do so.

The record shows that V. and N.'s relationship would likely continue. The L.s had supported V.'s relationship with her maternal family throughout V.'s life.

This support included frequent visits to grandmother's home, where V. often saw N. In addition, the L.s told DCFS that they were willing to continue facilitating contact with V.'s family members. The assumption that V.'s relationship with N. would be severed is not supported by the record. (See, e.g., *In re Daisy D., supra*, 144 Cal.App.4th at p. 293 ["Here, it was anticipated that the minor would be adopted by her paternal grandparents,

22

who intended to maintain contact between the minor and her half-siblings. . . . Thus, there was no evidence before the juvenile court that adoption would interfere with the minor's relationship with her half-siblings."].)

The juvenile court also speculated that V. might be confused at family holidays when V. and N. were not together. However, nothing in the record suggested this would be different than how V. had spent holidays her entire life. Indeed, mother testified that she did not spend holidays with V. and the L.s, but instead saw V. around the holidays at grandmother's house.

Valuing V.'s continuing relationship with N. over adoption would deprive her of the ability to permanently belong to the L. family, which would not be in her best interest. Indeed, there was evidence that maintaining legal guardianship would be detrimental to V. Even at the final review hearing described above, mother sought expanded overnight visitation that V. and the L.s did not want. Moreover, mother testified at the section 366.26 hearing that she would continue attempting to disrupt V.'s placement, stating that legal guardianship would be better for V. "[b]ecause maybe eventually I could get her back and be close to her." Adoption is the preferred permanency plan for precisely this reason—guardianship "'is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'" (*In re Celine R., supra*, 31 Cal.4th at p. 53.) These errors deprived V. of the stability and permanency of adoption.

## DISPOSITION

The juvenile court's September 13, 2023 and October 25, 2023 orders are reversed. The juvenile court shall enter a new order stating that there are no exceptions to adoption under

section 366.26, and selecting adoption as the permanent plan for V.


                              COLLINS, J.

We concur:


CURREY, P. J.


ZUKIN, J.

Filed 9/9/24

## CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re V.S., a Person Coming Under the Juvenile Court Law. | B332310 consolidated with B334112 (Los Angeles County Super. Ct. Nos. DK22355, DK22355B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Appellant;<br><br>      v.<br><br>V.S., a Minor,<br><br><br><br>      Appellant. | ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, it is ordered that the opinion filed September 4, 2024 be published with the exception of subsection C in the DISCUSSION section.

There is no change in judgment.

CURREY, P.J.              COLLINS, J.              ZUKIN, J.