Filed 9/18/24  In re Se.G. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re Se.G., A Person Coming Under the Juvenile Court Law. | 2d Juv. No. B334779 (Super. Ct. No. 22JV00063) (Santa Barbara County) |
| SANTA BARBARA COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. S.G. et al., Defendants and Appellants. | |

S.G. (mother) and H.G. (father) appeal the juvenile court's order terminating parental rights as to Se.G.  (Welf. & Inst. Code

§ 366.26.)[1]  Both parents contend the juvenile court erroneously found the parental-benefit exception inapplicable.  Mother asserts the sibling relationship exception applied as well.  Father claims Child Welfare Services (CWS) failed to satisfy its duty of inquiry under the Indian Child Welfare Act (ICWA).  We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In February 2022, CWS received a request for response to the home of two-year-old Se.G. and 14-year-old Sh.G.  Law enforcement had contacted mother, who was drunk and belligerent.  Father was present in violation of a domestic violence restraining order.  CWS detained Se.G and Sh.G. and placed them in a confidential resource home.  Se.G and Sh.G. had three adult brothers—Ivan, Manuel, and Joseph.

At the February 2022 detention hearing, the court ordered continued detention.  After a contested jurisdiction and disposition hearing in April 2022, the court found the allegations in an amended petition true by a preponderance of the evidence and adopted CWS's case plan.

At a six-month review hearing in October 2022 for which father was absent, the court ordered continued reunification services for mother and termination of services for father.  At a 12-month review hearing in May 2023, the court extended mother's reunification services.  At an 18-month review hearing in August 2023, the court terminated mother's reunification services and set a section 366.26 selection and implementation hearing.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

Sh.G., CWS social worker Alexis Zaragoza, the resource mother, court appointed special advocate (CASA) Mariana Solorio, mother, father, and the three adult brothers testified at the January 2024 section 366.26 hearing. As Sh.G. opposed adoption for herself, the hearing concerned Se.G.

Sh.G. was 16 years old at the hearing, and Se.G. was four. Sh.G. testified Se.G. always enjoyed visits with mother. Se.G. was excited to join the frequent phone or FaceTime calls with mother and would complain if they did not occur. Se.G. awoke from nightmares crying for mother. Se.G. said she wanted to go home with both mother and father. Se.G. would be "[d]evastated" if she could no longer see her brother Ivan.

The resource mother described Sh.G. as part of her family and would encourage contact between Sh.G. and Se.G. post-adoption. Sh.G. could continue living in the home. As for her brothers, Se.G. had mentioned only Ivan to the resource mother. The resource mother never heard Se.G. express to Sh.G. a desire to go home to her parents. The resource mother did not feel it would negatively impact Se.G. if she could not see her brothers or parents in the future.

Zaragoza had observed a portion of one visit between Se.G. and father. The interactions were appropriate. Zaragoza also observed a visit with mother. Se.G. was excited to get there and hugged mother. The visit was appropriate, affectionate, and positive.

Zaragoza did not "know that adoption really resonates with [Se.G.], that she understands that fully." Se.G. said getting another family—a "forever family"—"sounded good." Se.G. indicated she would like her resource parents to be her mother and father. According to the section 366.26 report, Se.G. "shared

3

she loves her home and her resource parents . . . ." When Zaragoza asked how Se.G. would feel if she could not see mother anymore, Se.G. indicated she did not know. With prompting, Se.G. agreed it might be a little sad if she no longer saw her parents.

Zaragoza did not believe severance of either parental relationship would be detrimental. Although Se.G. loved mother and was excited to see her, she was a "happy-go-lucky kid" who easily reintegrated with her resource home. Based on information obtained from the resource mother, Zaragoza testified that Se.G. rarely asked or talked about mother. Se.G. did not seek out or discuss father. Sh.G.'s testimony was the first time Zaragoza heard Se.G. had made any statement about wanting to go home with father.

Nor did Zaragoza believe severing Se.G's relationships with her brothers would be detrimental. As to Manuel and Joseph, Zaragoza cited the rarity of visits and Se.G.'s lack of conversation about them. Zaragoza acknowledged Ivan visited Se.G. more frequently and was sure the two had established more of a connection. Zaragoza believed severance of that relationship would be a "shift" but not "detrimental."

CASA Mariana Solorio supervised visits with mother and Se.G's brothers for nine months or longer. Solorio testified Se.G was excited to see her mother and would run and hug her upon arrival. Se.G. would become quiet toward the end of visits and sometimes asked Ivan to put her in the car seat. Solorio was unsure of the long-term impact of no further contact with mother. Solorio thought Se.G. would be sad to no longer see mother or the brothers.

4

Mother testified Se.G. tells her how much she misses and loves mother. Se.G. is always on her lap and is very affectionate. Mother was responsible for Se.G.'s daily care prior to removal. She described Ivan as a father figure.

Father testified he visited Se.G. approximately six times during the dependency period. Father had a call or FaceTime with his daughters about once a week since his restraining order was removed. He testified Se.G. is excited to see him at visits and calls him "daddy." During about half of the visits, Se.G. said she wanted to go home with mother and father.

Ivan, Manuel, and Joseph all testified to mother's care for and positive relationship with Se.G. prior to her removal at age two, as well as the positive nature of Se.G.'s visits with mother. Ivan and Joseph were living at home when Se.G. was born. Manuel was "living in between places." Manuel indicated he joins his brothers, mother, Sh.G., and Se.G. on FaceTime calls about three times per week.

The juvenile court found the parental-benefit exception inapplicable as to both parents. The court concluded both parents satisfied the visitation element. The court acknowledged Se.G. recognized and was happy to see her parents. However, neither relationship rose "to [the] level of a substantial positive emotional attachment." The court further concluded the benefits of adoption outweighed any detriment from severance of parental rights.

As to the sibling relationship exception, the court found a significant sibling relationship between Se.G. and Sh.G. The court determined the exception did not apply as to Sh.G. because the resource mother was committed both to keeping Se.G. and Sh.G. together and to maintaining their relationship. The court

found no significant sibling relationship as to Se.G.'s brothers. The court noted the benefits of adoption and found no evidence of detriment regarding the brothers. The court terminated parental rights.

*ICWA Proceedings Concerning Father[2]*

In March 2022, father informed CWS of Se.G.'s paternal grandmother and aunt, but he did not have contact information for them. He reportedly arranged to send CWS worker Meza a text message with contact information for his sister.

In November 2022, an administrative office professional emailed Child Welfare Worker Proietty to inquire about contact information for paternal grandmother and aunt. Proietty replied that she did not have contact information for either individual but would attempt to get that information.

At a March 2023 hearing, father indicated he had no Native American heritage in his family. Father filed an ICWA-020 form to a similar effect. In August 2023, the court found no reason to know ICWA applied to the children. In January 2024, the court reaffirmed its finding that ICWA did not apply.[3]

DISCUSSION

*Parental-Benefit Exception*

Mother and father assert the court erred in finding the parental-benefit exception inapplicable. We disagree.

---

[2] As neither parent challenges the ICWA proceedings concerning mother, we do not discuss them.

[3] Given that this case does not present exceptional circumstances, we deny CWS's motion to augment the record with an addendum to ICWA matrix report filed in the juvenile court on May 29, 2024. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.)

6

"""At a permanency plan hearing, the [juvenile] court may order one of three alternatives:  adoption, guardianship or long-term foster care.  [Citation.]  If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans."  [Citation.]'" (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316, quoting *In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.)  If the juvenile court finds the child adoptable, it must terminate parental rights unless one of several statutory exceptions applies.  (§ 366.26, subd. (c)(1)(B).)

The parental-benefit exception allows the court to consider a plan other than adoption if it "finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

A parent invoking the exception has the burden of proof and must establish three elements by a preponderance of the evidence:  (1) "regular visitation and contact" between the parent and child; (2) "a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).) The inquiry's focus is the child's best interests.  (*Id.* at p. 632.)

We review the first two elements for substantial evidence because they are essentially factual determinations.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)  We likewise review for substantial evidence any factual determinations underpinning the third element.  (*Id.* at p. 640.)  "In reviewing factual

determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*Ibid.*)

The third element's "ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C., supra,* 11 Cal.5th at p. 640.) A court abuses its discretion only when "'"the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."'" (*Id.* at p. 641.)

Substantial evidence supports the juvenile court's finding that Se.G. did not have a substantial, positive, emotional attachment to either mother or father. Se.G. was just four years old at the hearing. She had spent nearly half of her young life in the care of resource parents. (See *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) When asked an open-ended question probing how she would feel if she could not see mother anymore, Se.G. indicated she did not know. Zaragoza testified Se.G. rarely asked or talked about mother. (See *Caden C., supra,* 11 Cal.5th at p. 632.) As to father, evidence of attachment is even weaker given that he visited only about six times during the nearly two-year dependency. While both parents had positive interactions with Se.G., "the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent." (*In re Katherine J., supra,* 75 Cal.App.5th at p. 318.)

Nor did the juvenile court abuse its discretion in concluding that severing the parental relationships would not be detrimental when balanced against the benefits of the adoptive home.

Although Se.G. did not fully grasp the concept of adoption, she said getting another family—a "forever family"—"sounded good." She indicated she would like for her resource parents to become her mother and father. Zaragoza described Se.G. as a "happy-go-lucky kid" who easily reintegrated into her life with the resource parents. Zaragoza believed severing the parental relationships would not cause detriment to Se.G. The resource mother articulated a similar belief. Moreover, Se.G. shared that she loves her resource parents and home. The court did not act irrationally in finding the benefit of a stable, adoptive home outweighed any detriment from severance.

*Sibling Relationship Exception*

Mother argues the court erroneously found the sibling relationship exception inapplicable. We disagree.

An exception to termination of parental rights exists when "[t]here would be substantial interference with a child's sibling relationship . . . ." (§ 366.26, subd. (c)(1)(B)(v).) To make this determination, courts consider "the nature and extent of the relationship, including, but not limited to, [1] whether the child was raised with a sibling in the same home, [2] whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and [3] whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Ibid*.)

"If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*In re L.Y.L.* (2002) 101

9

Cal.App.4th 942, 952.) "[W]e apply the substantial evidence standard to the juvenile court's underlying factual determinations, and the abuse of discretion standard to the court's weighing of competing interests." (*In re D.O.* (2016) 247 Cal.App.4th 166, 174.)

The court did not err in finding this exception inapplicable. Termination of parental rights would not substantially interfere with Se.G.'s most important sibling relationship—her tie to Sh.G. While Se.G. had positive bonds with her brothers, particularly Ivan, substantial evidence supports the court's finding of no detriment. (See *In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952 [no substantial interference with sibling relationship if its termination would not cause detriment].) Se.G. had not lived with any of her brothers for nearly two years. Zaragoza testified no detriment would result if she no longer saw her brothers. The resource mother likewise felt Se.G.'s inability to see her brothers would not negatively impact her. When reviewing for substantial evidence, we do not evaluate witness credibility or reweigh the evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) This is not the "rare" case in which the sibling relationship exception applies. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

Finally, any deficiencies in the section 366.26 report do not require reversal. The totality of the evidence before the court, including extensive hearing testimony, provided a sufficient basis for its rulings on both the sibling relationship and parental-benefit exceptions. (See *In re Crystal J.* (1993) 12 Cal.App.4th 407, 413 [deficiencies in an assessment report go to the weight of the evidence].)

10

*ICWA*

Father contends CWS failed in its initial duty of inquiry under ICWA by not contacting paternal grandmother and aunt to inquire about Native American ancestry on the paternal side of the family. We are not persuaded.

ICWA defines an "'Indian child'" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C.S. § 1903(4) & (8); § 224.1, subd. (a).)

The juvenile court and county welfare department have an affirmative and continuing duty to inquire whether a child subject to dependency proceedings is or may be an Indian child. (§ 224.2, subd. (a).) This duty ""can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice."" (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 429.) Section 224.2, subdivision (b) specifically includes "extended family members," among others, within the duty of inquiry. (§ 224.2, subd. (b).)

"We generally review ICWA findings for substantial evidence." (*In re J.K.* (2022) 83 Cal.App.5th 498, 504; see also § 224.2, subd. (i)(2).) When the material facts are undisputed, "'we review independently whether ICWA requirements have been satisfied.'" (*In re J.L.* (2017) 10 Cal.App.5th 913, 918.)

CWS's inability to contact Se.G.'s paternal grandmother and aunt did not constitute abdication of the inquiry duty. According to a CWS report authored early in the dependency proceedings, father did not have those relatives' contact information. Father also did not indicate these relatives would or could have any information different than he had reported. The

11

report indicates father arranged to send a text message with contact information for the paternal aunt, but the record lacks evidence he did so.  While CWS has the duty to develop ICWA information, "we cannot ask the agency . . . to interview individuals for whom no contact information has been provided." (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082.)  Nor can we conclude CWS needed to repeatedly request the contact information to satisfy its duty.

DISPOSITION

The order terminating parental rights is affirmed.

<u>NOT TO BE PUBLISHED.</u>

CODY, J.

We concur:

GILBERT, P. J.

BALTODANO, J.

12

Gustavo E. Lavayen, Judge
Superior Court County of Santa Barbara

_____

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant S.G. (mother).

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant H.G. (father).

Rachel Van Mullem, County Counsel, Lisa A. Rothstein, Senior Deputy County Counsel, for Plaintiff and Respondent Santa Barbara County Department of Social Services.