Filed 1/31/25  In re L.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re L.M. et al., Persons Coming Under the Juvenile Court Law. | |
| | D084598 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. EJ4710B-C) |
| v. | |
| L.F., | |
| Defendant and Appellant; | |

APPEAL from orders of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Melissa A. Chaitin, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

L.F. (Mother) appeals the juvenile court's order terminating her parental rights over her son, L.M. (Son), and daughter, J.C. (Daughter)

(together, the children).[1]  She asserts the juvenile court erred in declining to apply the beneficial parent-child relationship exception to termination of parental rights.  (Welf. & Inst. Code,[2] § 366.26, subd. (c)(1)(B)(i).)  We reject Mother's contention and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

In September 2021, Mother displayed behaviors suggesting substance abuse when she picked up Son from school.  After being denied entry to conduct a welfare check at Mother's home, a social worker obtained an investigative search warrant.  Upon entering the home, the social worker observed numerous health and safety hazards, including:  18 inches to two feet of clothes, trash, toys, food, and other miscellaneous objects covering the floor; no clear walkways in the house; a chef's knife within reach of the children on the stove; and a smell of vomit and marijuana throughout the house.  The social worker also observed Son yelling at Mother and running in the street.  Daughter's father, M.C., admitted frequent drug use and tested positive for amphetamine and methamphetamine.

Mother agreed to a safety plan requiring that the children be removed from the home.  Following an unannounced visit confirming the home was

---

[1]     At the time of the Welfare and Institutions Code section 366.26 hearing, Son was nine years old, and Daughter was four years old.  The children have different fathers and neither father has appealed.  Mother has another older child, J.F., who was also a dependent of the juvenile court but is not a subject of this appeal.

[2]     Undesignated statutory references are to the Welfare and Institutions Code.

[3]     Because our discussion addresses the relationship between Mother and her children, in the interest of brevity, we omit most of these details here and instead provide an outline of the proceedings leading to the court's findings.

2

free of hazards, the San Diego County Health and Human Services Agency (Agency) allowed the children to return. But during another unannounced visit in early November 2021, the home had reverted to its previous state of disarray. Mother ordered the social worker to leave and refused further contact with the Agency.

The Agency then filed section 300 petitions for the children due to the unsanitary and hazardous condition of the home, Mother's failure to supervise Son, and M.C.'s drug use. At the detention hearing, the juvenile court made a prima facie finding on the petitions, detained the children out of Mother's care, and ordered visitation for her. The court detained Son with the maternal uncle and Daughter with the paternal aunt. At the jurisdiction and disposition hearing in March 2022, the court sustained the petitions, removed the children from Mother's home, placed them with relatives, ordered reunification services for Mother, and granted her unsupervised visitation.

In late October 2022, Son moved to the home of a maternal aunt who was better able to meet his needs. At the contested six-month review hearing in early December 2022, the court ordered continued reunification services, including liberal unsupervised visits for Mother, and granted the Agency discretion to lift supervision and begin overnight visits with Mother. In a January 2023 status report, the Agency reported Mother's progress with case plan services. She had cleaned her home and the social worker approved unsupervised visitation with the children there. Although the Agency encouraged Mother to have extended unsupervised visitation with the

children over the holidays, she declined stating she would not know " 'what to do with the kids for 8 hours.' "

A June 2023 status report noted that Mother had relocated to Hemet, California to live closer to her siblings. Son resided in Hemet with the maternal aunt. Mother was discharged from therapy due to lack of attendance. She did not participate in the children's education, medical, or developmental appointments, did not ask caregivers about the children's education or health, and was not receptive to advice. The Agency filed a section 388 petition to change Mother's visitation from unsupervised to supervised after she left Son unattended and could not locate him. At the July 2023 contested 12-month review hearing, the court terminated reunification services and made an interim order for supervised visits pending a contested hearing on the Agency's section 388 petition.[4]

After the hearing in late September 2023, the juvenile court granted the petition and ordered supervised visitation.[5] The court noted that Son had been diagnosed with ADHD and PTSD but Mother did not provide the structure Son needed during visits. It also expressed concern regarding Mother's supervision and attentiveness toward all three children during visits.

At the contested section 366.26 hearing in late November 2023, Dr. Elizabeth Stanton, a clinical psychologist, testified regarding a study she conducted to evaluate the bond Mother had with the children. Dr. Stanton acknowledged that an accepted bonding study protocol did not exist. Instead,

---

[4]    Mother filed a notice of intent to file a writ petition but we dismissed the matter after her appellate attorney found no viable issues.

[5]    Mother appealed this order but we dismissed the appeal after appellate counsel indicated no viable appellate issues existed.

4

she developed her own, which relied on direct observation. Dr. Stanton opined that a healthy, secure attachment existed between the children and Mother. She came to this conclusion after observing two visits between the children and Mother. She did not review the visitation history between Mother and the children, speak to the children or collaterals, or talk to the children about being adopted, believing this information was irrelevant.

The court determined that Dr. Stanton's testimony lacked any probative value because she only considered a "snapshot" in time and disregarded other information. It found the children were likely to be adopted and declined to apply the beneficial parent-child relationship exception to termination of parental rights. Although Mother had regular and consistent visitation with the children, it concluded that her visits were akin to those of a familiar relative and the benefits of adoption outweighed maintaining the children's relationship with Mother.

## DISCUSSION

### A. *General Legal Principles*

During a section 366.26 hearing, the juvenile court must choose one of three permanent plans: adoption, guardianship, or long-term foster care. (§ 366.26, subd. (b).) Of these options, "[a]doption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) When the court finds by clear and convincing evidence that the child is adoptable, "the court shall terminate parental rights and order the child placed for adoption" unless a statutory exception applies. (§ 366.26, subd. (c)(1).) "Once the court determines by clear and convincing evidence that a child is likely to be adopted, the burden shifts to any party opposing adoption to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in

5

section 366.26, subdivision (c)(1)." (*In re D.O.* (2016) 247 Cal.App.4th 166, 173 (*D.O.*).)

A statutory exception to the preference for adoption is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) This exception applies where "[t]he court finds a *compelling* reason for determining that termination would be detrimental to the child" (*id.*, subd. (c)(1)(B), italics added), including where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id.*, subd. (c)(1)(B)(i).) This exception "allows a child a legal basis for maintaining a relationship with the child's parent if severing that relationship would, on balance, harm the child," thereby "preserv[ing] [a] child's right to [a] relationship [with his or her parent] even when the child cannot safely live with that parent. What it does not allow is a judgment about the parent's problems to deprive a child of the chance to continue a substantial, positive relationship with the parent." (*In re Caden C.* (2021) 11 Cal.5th 614, 643 (*Caden C.*).)

For the beneficial parent-child relationship exception to apply, a parent must show by a preponderance of the evidence (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) A "crucial aspect of the court's responsibility" at the section 366.26 hearing is deciding "whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new

6

adoptive home.  By making this decision, the trial court determines whether terminating parental rights serves the child's best interest." (*Caden C.,* at pp. 631–632.)

We review the first two elements of the test for substantial evidence and the third for an abuse of discretion.  (*Caden C., supra*, 11 Cal.5th at pp. 639–640.)  In reviewing for substantial evidence, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists.  (*Id.* at p. 640.)  In reviewing for an abuse of discretion, we consider whether the juvenile court made an arbitrary, capricious, or patently absurd determination.  (*Id.* at p. 641.)

**B.** *The juvenile court did not err in finding inapplicable the beneficial parental relationship exception to adoption*

The juvenile court found Mother met the first element set forth in *Caden C., supra*, 11 Cal.5th 614:  consistent visitation with the children.  This finding is unchallenged.  Mother does contest, however, the court's findings that she did not meet her burden of proving the second and third elements—that a "substantial, positive, emotional attachment to the parent" existed and "terminating that attachment would be detrimental to the children even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at p. 636.)

On the second element, the juvenile court found that Mother's visits with the children were like those of a familiar relative.  In arguing no substantial evidence supports the juvenile court's finding, Mother focuses on the positive aspects of her visitation.  She consistently came to visits with snacks and activities, the children displayed affection toward her, and, as the Agency acknowledged, it was evident Mother loved the children.  By citing only evidence that supports her position, Mother misapplies the substantial

7

evidence standard we use to review the court's finding that she had not met the second prong.

On this element, the court was entitled to consider factors including " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C., supra*, 11 Cal.5th at p. 632.) Son was six years old, and Daughter was one year old when removed from Mother's custody. At the time of the contested section 366.26 hearing, the children had spent over two years and six months out of Mother's care. The children did not ask for her between visits and never exhibited signs of distress at the end of visits.

At the start of the proceedings, a school nurse described Son as "resistant" to Mother. The nurse reported that Son appeared frustrated when he had to go home with Mother. She also witnessed Son running away from Mother and not wanting to leave school with her.

During a home visit, a social worker heard Mother yell at Son to go to his room. The two then yelled at each other until Son hit Mother and said, " 'shut up you fucking bitch.' " During visits, Son often defied Mother's attempts to redirect him. For instance, when Mother repeatedly asked Son to stop throwing a beanbag that could hurt Daughter, he ignored her until she had to take it away. During that same visit, he ignored her attempts to redirect him as he threw toys and other objects, prompting the social worker to step in. When Mother said, " 'Please don't leave the room,' " Son isolated himself and walked toward the door.

To help calm him, the social worker mentioned that his caregiver was waiting in the lobby. Son quickly cleaned up the toys as Mother had asked, grabbed his glasses and backpack, and prepared to leave. He went directly to

his caregiver, who noticed he was upset. The caregiver spoke with him privately until his mood improved.

Son's caretaker reported that during visits, Mother does not engage Son and regularly has him play on electronics. When Son asks for Mother's attention, she often responds, " 'What [Son]?!' " and then further ignores him. Mother's lack of attention caused Son to gravitate toward negative behaviors because she does not respond when he seeks her attention. When Son misbehaves, Mother frequently does not address his behaviors until they escalate, at which point she often gives Son an electronic device to appease him. The social worker noted that when Son seeks Mother's attention, he has discovered that misbehaving will draw her focus even if the attention he receives is negative.

Son's caregiver observed that Son is "triggered" by visits with Mother and has a hard time regulating his emotions afterwards. The caregiver said that Son gets defiant and nervous on the way to the visits; after visits, his behavior is more negative than positive. The record reflected numerous instances when Son would act out during or after visits with Mother. Although Son's caregiver gave Mother updates regarding Son's behaviors, she was often dismissive and uninterested in learning about Son's need for structure and appropriate discipline.

Daughter's caregiver reported that at the time of the placement, Daughter seemed scared and anxious, would not make eye contact, and barely spoke any words. About a year later, the caregiver reported "a huge shift in [Daughter's] behavior and development" and stated the child was doing very well. Daughter's caregiver observed that while Daughter is a happy little girl, she displayed concerning behaviors at school (throwing things, biting, hitting furniture, and tantrums), which were more prevalent

9

after visiting Mother. In July 2023, Daughter received services and attended speech therapy twice a week but Mother never asked about the child's speech development or services she has been provided. Both sets of caregivers noted that Mother neither participates in nor inquires about the children's education, health, or development, and she ignores their advice on addressing the children's emotional and developmental challenges.

Mother relies on Dr. Stanton's bonding study as evidence showing the children had a substantial positive emotional attachment to her. Dr. Stanton based her assessment on three addendum reports dated January, May, and July 2024, and two visits she observed in June 2024. Dr. Stanton developed her own bonding study method to gather the requested information and provide a recommendation. She stated that the opinions or observations of others, including the children's caregivers, were irrelevant to her conclusion. She did not review the visitation history between Mother and the children, as she believed it would not affect her observations.

The juvenile court concluded that Dr. Stanton's testimony had "no probative value." It took issue with creating her own bonding study protocol based entirely on her observations and dismissing everything else as irrelevant. The credibility of experts and the validity of their conclusions are decisions for the trier of fact to determine, and we are not permitted to reassess or reinterpret that evidence. (*People v. Poulsom* (2013) 213 Cal.App.4th 501, 518.) Even if that were not the case, at a minimum, a bonding study should consider: (1) the child's age; (2) the length of time the child spent in the parent's custody; (3) whether the parent-child interactions have had positive or negative effects; and (4) the child's individual needs. (*In re M.V.* (2023) 87 Cal.App.5th 1155, 1180.) Dr. Stanton's bonding study report did not consider any of these factors.

10

Dr. Stanton's report explained that her task was to assess the attachment pattern between Mother and the children. She defined "attachment" as the quality of the parent-child relationship, influenced by the parent's responsiveness to the child. She also identified insecure attachment patterns as avoidant, resistant, or disorganized.[6] Had Dr. Stanton reviewed the three-year history of the children's interactions with Mother, it would have revealed substantial evidence of an insecure attachment as defined in her report.

Even assuming Mother had shown a positive emotional attachment to the children, it was not an abuse of discretion to conclude that adoption by dedicated caregivers outweighed any potential harm from severing the children's relationship with her. There was no evidence the children experienced any distress when their visits with Mother ended. At the start of the proceedings, Son did not want to return to Mother's care, indicating he needed to know he would be safe before moving back with Mother. He told the social worker that he feels secure with his caregivers and supports the idea of being adopted by them. At the same time, he expressed missing Mother and wanting to be with her, but voiced concerns about whether he would be safe with her.

---

[6] The report stated: "Children with an avoidant pattern indicate their insecure attachment by avoiding interaction with their parent. A child with a resistant pattern exhibits their insecurity by seeking and then resisting (kicking and pushing away) the parent. Children with a disorganized pattern of insecure attachment exhibit characteristics of avoidant and resistant patterns and may also appear confused and afraid. Parents of insecurely attached children may be described as generally unresponsive to the child's signals and needs. These parents are often irritated and angry when interacting with their children. Others may be neglectful and physically abusive."

11

When the social worker later addressed adoption in an age appropriate manner, Son stated, " 'Oh heck no, no I want to see [Mother].' " The following month, Son again indicated he did not want to be adopted. At the same time, he recognized that "[Mother] didn't treat me well. She wasn't caring for me. Basically, my brother had to help me all those times. Even those times I didn't know how to make food. My brother had to make food. That should be my mom's job, to feed me. But she wasn't feeding me those other times."

In July 2024, a month before the contested section 366.26 hearing, Son's feelings about adoption had changed. He told the social worker, " 'I'd like to get adopted because I have everything I want and I need already.' " Although Daughter is too young to understand the concept of adoption, she referred to her caregivers as " 'mom' " and " 'dad' " and recognized her placement as "home."

Based on the positive interaction she observed between the children and Mother, Dr. Stanton opined that the children could initially experience feelings of rejection or guilt should Mother's parental rights be terminated. Later in life, they could struggle with long term significant relationships based on the child's experience with separation. The Agency acknowledged these concerns, but noted Son was working with his therapist to address these experiences and "demonstrated his ability to be resilient and progress in all areas since being in protective custody." Daughter was similarly working with her caregivers, extended family, and school to address behavioral issues, and she also demonstrated her resilience and progress since being in protective custody. The Agency indicated that should either child experience any adverse reactions or emotions with the discontinuation of visits, their experiences could be addressed with ongoing therapeutic services, consistent care, and the stability offered by their caretakers.

12

In summary, the record supports the juvenile court's determination that the benefit and security provided by the children's prospective adoptive caregivers outweighed the harm that would be caused by the loss of their relationship with Mother. Thus, the court acted within its discretion in determining the circumstances were not exceptional, such that the termination of Mother's parental rights would be detrimental to the children.

## DISPOSITION

The orders terminating parental rights are affirmed.


DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


KELETY, J.