Filed 1/6/26  In re Ella G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re ELLA G., Persons Coming Under the Juvenile Court Law. | B345505 (Los Angeles County Super. Ct. No. 22CCJP00047E, F) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.G., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Davis, Judge.  Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellant C.G. (mother) appeals from an order terminating her parental rights to two of her children, Ella G. (born September 2017) and Emily R. (born July 2019).[1]  Mother contends the juvenile court erred in declining to apply the sibling relationship exception to termination of parental rights, and there was error under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California statutes.

As we find mother failed to show the sibling relationship exception to termination of parental rights applied, the juvenile court therefore did not err in declining to grant the exception. However, because the Los Angeles County Department of Children and Family Services (DCFS) concedes the record does not reflect DCFS made a diligent and good faith effort to gather information about the children's membership status or eligibility under ICWA, we conditionally reverse with instructions to the court and DCFS to comply with the inquiry requirement of

---

[1]  At the time of the proceedings, mother had six minor children: Steven R. (born January 2004), Angelica R. (born December 2005), Joshua R. (born January 2011), Isabella R. (born April 2013), Ella G. (born September 2017), and Emily R. (born July 2019).  Mother also had an adult child, Bryan R.  This appeal pertains only to Ella and Emily, mother's two youngest children.  The other siblings are mentioned as necessary.

Welfare and Institutions Code section 224.2 and comply with the notice provisions if necessary.[2]

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

**Family history**

Humberto R. (father) is the presumed father of mother's six minor children.[3]  He died in 2021.

The family had a history in the dependency system.  In December 2016, the juvenile court assumed jurisdiction over mother's then five minor children, Bryan, Steven, Angelica, Joshua, and Isabella, based on the parents' domestic violence and mother leaving the children in the care of a maternal aunt without a plan for their ongoing care.  The court terminated jurisdiction in August 2018 with an order placing the children with mother.

**Current referral, section 300 petition and detention**

In December 2021, Ella and Emily's sister, eight-year-old Isabella, was found walking on the street alone, crying and wet from rain.  She reported being hit by mother.  Law enforcement discovered mother, her boyfriend Gustavo G., and the children Joshua, Ella, and Emily, driving in a car.  The family was homeless and living in the car.  The interior of the car was in a disastrous state, strewn with clothing and  partially eaten food. In addition, all the children had lice.  The back window of the car was broken, and the child seat was not properly installed.

---

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[3]     Gustavo G. was initially believed to be the father of Ella, but during the proceedings it was discovered he was not.

It was reported mother and Gustavo were locked in the bathroom of a motel room and Isabella needed to use the restroom. According to mother, the child "threw a fit" and left the motel room. It was unknown how long she was missing before mother realized she was gone and went looking for her. Gustavo had methamphetamine in his pocket and mother did not have a license to drive. Mother was arrested for child endangerment and corporal punishment. Gustavo was arrested for child endangerment, drug possession and outstanding warrants.

On January 4, 2022, DCFS filed a petition pursuant to section 300 on behalf of Ella, Emily and their siblings based on Gustavo G.'s substance abuse and mother's inadequate supervision of Isabella.

Mother was present at the detention hearing on January 7, 2022. The juvenile court found DCFS had established a prima facie case and ordered the children detained from mother.

**Jurisdiction and disposition**

In a January 26, 2022 jurisdiction/disposition report, DCFS reported Steven and Angelica were detained at large and their whereabouts were unknown. Angelica reported she was staying with her boyfriend but did not disclose the address. In a February 2022 last minute information for the court, DCFS reported minor Angelica was two months pregnant.

On January 18, 2022, the child protection hotline received a call from Manuel R., a paternal uncle to the children. The paternal uncle stated he heard the children were in foster care and was calling to inquire about providing care for the children. The dependency investigator confirmed with mother that Manuel R. was a paternal uncle to the children. DCFS requested an "ICPC," as Manuel R. lived in Nevada.

Ella, Emily, Isabella and Joshua had been placed together at the foster home of Mr. and Mrs. S. However, Joshua became increasingly aggressive and was placed on a psychiatric hold at Harbor-UCLA Medical Center, and the caregivers requested Joshua be re-placed. Isabella, Emily and Ella remained placed in the home of Mr. and Mrs. S.

On April 14, 2022, the juvenile court sustained the section 300 petition as to mother's failure to appropriately supervise Isabella.

At the disposition hearing on June 30, 2022, the juvenile court declared the children dependents of the court, ordered the children removed from mother and suitably placed, and ordered family reunification services. The court also ordered DCFS to facilitate sibling visits.

**Section 342 petition**

In August 2022, mother tested positive for methamphetamine.

On September 14, 2022, DCFS filed a subsequent petition under section 342 alleging the children were at risk due to domestic violence between mother and her companion, Erick L., and because mother had a history of substance abuse and was currently abusing alcohol and methamphetamine. The petition also alleged mother allowed her companion to drive Ella and Emily in his car without a car seat and left Joshua in a dangerous situation by leaving him for extended periods without supervision.

On February 8, 2023, the juvenile court sustained the petition and ordered mother to participate in a full drug treatment program and random drug testing.

**Family reunification period**

The children began having sibling visits in September 2022. Mother attended some of those visits. During the visits, the children appeared to enjoy each other's company and seemed well-bonded.

In December 2022, mother stopped coming to visits and stopped communicating with DCFS. Mother briefly resumed contact with DCFS in May 2023 but did not resume visiting the children. DCFS contacted several family members including maternal great aunt, maternal aunts and uncles, and maternal grandmother, all of whom were unwilling to provide mother with support or assist in possible relative care for the children.

An October 2022 letter from the children's therapist reported they had been participating in therapy since April 2022. Ella and Emily quarreled regularly, and the therapist was working to decrease their negative behaviors. In August 2022, it was determined Emily no longer needed therapy, and she stopped.

The children continued to have sibling visits, including overnight visits at Joshua's foster home from December 2022 through February 2023. Visits were suspended in February and March 2023 due to Isabella not wanting to attend, Joshua allegedly hitting the children, and the children not feeling comfortable resuming sibling visits. After much engagement and encouragement, visits resumed.

Sibling visits were again temporarily suspended in May 2023 due to Angelica not being motivated to visit and Joshua having outbursts and runaway episodes. Joshua was moved to another placement only to receive another request to have him removed. However, visits resumed in June 2023 and the situation stabilized.

During an August 2023 visit to the children's caregivers, the caregivers reported Isabella would get upset when things did not go her way. Ella was easily upset and fought a lot with Emily. The children had overly friendly behaviors and would wander around with others. The children appeared comfortable with the caregivers, were in good spirits and reported no concerns.

**Twelve-month review hearing**

At the 12-month review hearing on September 18, 2023, mother was not present. The court found mother's progress to be unsubstantial. Reunification services were terminated, and the court set a permanency planning hearing.

**Permanency planning**

In a March 2024 report, it was noted Isabella, Emily and Ella loved each other and wanted to be together. They comforted each other and played together. Ella's therapist reported she was working on reducing Ella's tantrums and aggressive behaviors towards her sister. In October 2023, a sibling visit was canceled because Joshua did not want to attend. The children's caregiver noted Joshua preferred to be with other boys and not with his sisters.

DCFS reported Isabella, Ella, and Emily were strongly bonded with their caregivers and continued to thrive in their home. The children referred to their caregivers as "mama Mila" and "Papa Felix." The children wanted to continue sibling visits with Joshua and Angelica, but Joshua and Angelica's interest in the visits waned, and the visits became less frequent. Isabella, Ella and Emily each expressed a desire to stay with their caregivers if they were unable to return to mother. The caregivers expressed a strong desire to provide the children permanency through adoption.

Isabella was present at a review hearing on March 15, 2024. Maternal relatives Patricia, Felipe and Diana were present at the hearing. Maternal great aunt Patricia requested placement of Isabella and her sisters. Isabella's attorney explained this was the first time she was made aware that maternal relatives were "even in the picture." However, when she let Isabella know her family was present "she did get a little emotional because she hadn't seen them in so long" and "she really did want to establish or reestablish that relationship with her family."

In an April 2024 meeting, it was noted the children's paternal relatives appeared in court to request visits and be considered for placement.[4] The caregivers explained they were no longer interested in providing permanency through adoption for the children. The caregivers were not in agreement with visits with the children's relatives, noting that since Isabella was informed of the relatives' involvement, she displayed challenging behaviors they had worked hard to decrease. The caregivers expressed concern that involvement of the relatives had caused their relationship with Isabella to decline.

When the social worker followed up with the children, Isabella said she was not sure about wanting to be adopted by her caregivers. She wanted to have visits with her aunt Diana and uncle Felipe first to "see how it is." Isabella acknowledged she had previously been in agreement with adoption but, after learning about her relatives, changed her mind. Ella too wanted visits with her relatives because "Bella told us that we were going

---

[4]     Though the report mentions paternal relatives, it appears they were referencing the maternal relatives' recent appearance in court.

to live with our tia," but after further discussion, expressed she wanted to live permanently with her caregivers. Emily wanted to stay with the current caregivers.

DCFS requested a 120-day continuance in order to identify the best permanent plan for the children.

On May 9, 2024, the juvenile court ordered DCFS to conduct a child and family team meeting with the current caregivers to try to preserve the placement for the children.

Mrs. S. expressed her desire for a closed adoption. She was in favor of phone and virtual visitation only and in-person visitation for special occasions or holidays. She noted changes in the children's behavior following family visits. Specifically, Isabella would ignore the caregiver and say, "Why should I listen to you when I have my family." Isabella would also tell Ella and Emily not to listen to the caregiver because she was not their mother. The caregiver was afraid of the children's adult brother, Bryan, who Joshua said had a gun. After much discussion between the social worker and the family, the caregivers decided to proceed with the adoption process.

In a status review report filed in August 2024, DCFS reported Isabella, Ella and Emily all reported wanting to stay with their current caregivers if they could not go home. Alternatively, they wanted to be placed with Angelica's caregiver.

In an addendum report filed later in August 2024, the caregivers confirmed they would continue with the adoption process. They also agreed to support postadoption contact with the children's sister, presumably Angelica. When interviewed privately, Isabella reported she was unsure about the adoption and did not know if it was her only option. Ella and Emily expressed they liked living with their current caregivers.

In a last minute information to the court filed September 12, 2024, DCFS reported contact with maternal uncle Felipe and maternal grandmother during efforts to reach mother, but neither relative requested visits or custody of the children.

Though Isabella expressed a desire to be placed with Angelica's caregiver, she also felt "okay" staying with her current caregivers. As to her aunt Patricia, Isabella felt "okay but not that safe." Isabella wanted the judge to know she wanted to stay with her sisters.

When asked about Patricia, Ella said she did not remember her but wanted to live with her because "Bella (Isabella) told me she has three rooms and toys. She has things to do our hair." She also expressed wanting to live with Angelica but did not mind remaining in the home of her current caregivers.

Emily wanted to remain in her current home.

In November 2024, Mr. and Mrs. S. communicated that they were still committed to providing permanency for the children, but they expressed concern regarding Isabella and her behavior. She had become increasingly aggressive towards her sisters and often told the caregivers they were not part of her family. Her behaviors had escalated in the past month.

Isabella reported feeling safe in the home but continued to express hesitance about the adoption. She did not want to be adopted but wanted to remain with her sisters. She was unable to elaborate on the reasons she was no longer open to adoption.

Ella and Emily reported they were happy in their placement.

By March 2025, Isabella expressed she was unhappy in her current placement and only remained there because of her sisters. She wanted to be with her sisters, but she was sacrificing her happiness for them. Her caregivers were strict, which

10

hindered her ability to be herself. She was no longer interested in adoption or legal guardianship with the current caregivers and requested to be moved from the home. No concerns as to abuse or neglect were expressed. According to the social worker, Isabella "is hopeful for relatives to step forward to care for her and her siblings, reflecting her longing for familial ties and the possibility of maintaining a connection with her biological family. This shift highlights the complexity of her emotions given that her biological family show no sense of care as to Isabella and her siblings." On March 25, 2025, Isabella told a social worker, "I don't think I could handle being [at the caregivers' home] any longer." The caregivers wanted to honor Isabella's request and agreed to a placement change for Isabella.

There were no concerns for Ella or Emily. They appeared to have a strong attachment to the caregivers and a sense of security. They were happy in their placement and wanted to continue with the adoption. The children had been in the home since December 2021.

In March 2025, a postadoption contact agreement was established between the caregivers and adult sibling Angelica. The parties agreed the children would continue contact with their sibling.[5] Mrs. S. "recently demonstrated insight as to sibling bond and the willingness to support sibling visits."

---

[5] At the section 366.26 hearing, Emily and Ella's attorney stated the postadoptive contract also provided for postadoption contact with "an adult sibling," Isabella, and Joshua. Neither party has provided a citation to the record showing the actual signed agreement. Mother's attorney did not disagree with the assertion regarding the postadoption contract, nor did she clarify the record as to the scope of the agreement. Instead, mother's counsel stated, "I understand [Emily and Ella's attorney] did

DCFS recommended termination of parental rights as to Emily and Ella in order to offer them a permanent adoptive home with Mr. and Mrs. S. A 90-day continuance was requested as to Isabella and Joshua.

**Section 366.26 hearing**

The section 366.26 hearing took place on April 11, 2025. Mother was present in custody with counsel. No children were present.

Ella and Emily's attorney noted she had not been informed Isabella was leaving the placement and was unsure how that would affect Ella and Emily. However, she noted the girls had been in the home for three years and were very young. She further noted there was a postadoptive contract ensuring sibling contact following adoption.

Mother's counsel objected to termination of parental rights, arguing the sibling bond exception found under section 366.26, subdivision (c)(1)(B)(v) applied. Counsel argued the termination of mother's parental rights would be detrimental to Ella and Emily given their bond with their siblings. Counsel pointed out that Emily and Ella had always been in the same placement with

mention a consortium referral as to the siblings; however, as she noted, her own client's [*sic*] position would likely change knowing that Isabella would be no longer living with them as well." In her reply brief on appeal, mother argues the children's trial counsel "erroneously" assured the juvenile court that the consortium agreement protected the children's sibling relationships and included Isabella. Mother contends, without citation to the record, that Isabella's proposed removal from Ella and Emily's caregiver's home meant she was no longer part of the agreement. Because mother has failed to cite evidence supporting this contention, we decline to consider it.

Isabella, and Isabella would now be removed from the home. Although Emily and Ella expressed that they wanted to be adopted, counsel said, "I'm not sure they grasp or understand what that means under the law, that they would not have any contact with their biological siblings under the law." Counsel argued it was likely Ella and Emily would "lose that contact with all biological siblings once the court terminates mother's parental rights." The caregivers had expressed concern about visits with the extended family, and with Isabella being removed, there would be a further issue with ensuring the sibling bond stayed intact. Counsel further pointed out even Ella and Emily's counsel was not sure how they would feel about adoption knowing that Isabella would not be living with them. Counsel requested the court grant legal guardianship as the permanent plan given her position that the sibling bond exception applied in the case.

Initially the court addressed Isabella's counsel's request that the court order DCFS to "make best efforts to facilitate sibling visitation moving forward between my client and the other siblings." The court responded, "Absolutely. [DCFS] please make your best efforts to facilitate sibling visitation between all of the kids and certainly between Isabella, Joshua, Ella, and Emily."

The court then addressed mother's argument regarding the application of the sibling exception. The court did not believe mother had standing to make the argument, as none of the children's attorneys had made the argument. Because none of the attorneys for the children made the request, the court found the exception did not exist in this case.

Counsel for DCFS then pointed out to the court that detriment would have to be evaluated from the perspective of the

13

children who are going to be adopted—Ella and Emily. These two children had consistently indicated a desire to be adopted. In addition, counsel for DCFS pointed out there was no evidence of detriment to Ella and Emily, particularly as the caregivers had already voluntarily signed a postadoptive agreement. "They have shown through that the willingness and an agreement to continue sibling contact; so I would submit there's no evidence that there would be an interference" with the sibling relationships. The court noted, "I'm in agreement with all of that."

The court found by clear and convincing evidence Ella and Emily were adoptable, and there were no applicable exceptions to termination of parental rights. The court then terminated mother's parental rights.

Mother's counsel objected on the grounds she had standing to raise the sibling exception. The court acknowledged mother's objection but stated, "[the] court finds there is no sibling bond information submitted sufficient enough to provide that [exception]."

**ICWA investigation**

The ICWA-010 form attached to the section 300 petition stated mother had been asked about her ancestry and denied any known Indian ancestry.

On January 7, 2022, mother and Gustavo G. each filed parental notification of Indian status forms (ICWA-020) indicating none of the listed factors regarding Indian children applied to their children. Mother submitted a relative information sheet identifying a maternal great aunt, a maternal cousin, and Ella's paternal grandmother for consideration for placement or to serve as visitation monitors.

On January 10, 2022, the juvenile court found it had no reason to know Ella and Emily were Indian children. Mother and Gustavo denied having any American Indian heritage. Mother reported she was born in Los Angeles and partially raised in Mexico.

On January 18, 2022, father's brother, Manuel R., contacted DCFS expressing interest in caring for the children. It does not appear he was questioned about the children's possible Native American ancestry.

On October 7, 2022, mother denied American Indian ancestry and any knowledge of any American Indian ancestry as to father, who was of Mexican descent.

In a July 2023 report, DCFS reported the children were unaware of any American Indian ancestry. Maternal grandmother and maternal aunts also denied any American Indian ancestry, reporting they were of Mexican heritage.

In an August 2023 report, DCFS reported maternal aunt Patricia denied any American Indian heritage. The maternal relatives were not in contact with the paternal relatives, and the children had no contact information for paternal relatives. Angelica denied any American Indian heritage on either side of her family but stated she did not really speak to any relatives. DCFS unsuccessfully sought to contact Bryan.

In October 2023, DCFS filled out a family tree with Angelica in an effort to identify relatives with information regarding potential American Indian heritage. She identified the maternal grandmother and maternal aunts Diana, Vanessa, and Felipe. She could not provide any information as to paternal relatives and noted she shared her name with an aunt.

15

In January 2024, Angelica reported her father was born in Mexico. Angelica believed the maternal grandmother was from Tijuana, Mexico.

Isabella did not know of any American Indian ancestry but reported doubt because her family was from Mexico.

In March 2024, maternal aunt Patricia denied any Native American heritage, adding the family was of Mexican heritage with roots in Tijuana. Maternal aunt Vanessa said the same thing. She noted both maternal grandmother and maternal grandfather were from Mexico.

On March 6, 2024, maternal grandmother denied any Native American heritage in herself, mother, or the children, reporting the family was Mexican as far back as she knew. Maternal grandmother's mother and father were born in Tijuana.

On April 11, 2025, DCFS noted father was deceased and DCFS had no contact information as to any paternal relatives. The juvenile court found it had no reason to believe ICWA applied.

**Notice of appeal**

On April 11, 2025, mother filed a notice of appeal from the court's order terminating her parental rights to Ella and Emily.

## DISCUSSION

### I. Sibling relationship exception

#### A. *Applicable law and standard of review*

At a section 366.26 hearing the trial court is required to select and implement a permanent plan for the dependent child. (§ 366.26, subd. (b).) If the court determines by clear and convincing evidence the child is likely to be adopted, the court "shall" terminate parental rights and order the child placed for adoption unless one of the statutory exceptions is met. (§ 366.26,

subd. (c)(1).)  "The parent has the burden of establishing an exception to termination of parental rights."  (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 291; see Cal. Rules of Court, rule 5.725(d)(2).)

The sibling relationship exception exists when the juvenile court determines there is a compelling reason for the court to conclude the termination of parental rights would be detrimental to the child due to substantial interference with a sibling relationship.  (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.)  In making this determination, the court should consider the "nature and extent of the relationship," including, but not limited to, "whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."  (§ 366.26, subd. (c)(1)(B)(v).) "The author of the legislation adding the sibling relationship exception anticipated that 'use of the new exception "will likely be rare,"' meaning 'that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption.'"  (*In re Daisy D., supra*, 144 Cal.App.4th at p. 293.)  "The sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption."  (*In re Daniel H., supra*, at p. 813.)

The party opposing adoption first must show termination of parental rights would be detrimental to the child due to substantial interference with the sibling relationship.  (§ 366.26, subd. (c)(1)(B)(v).)  "If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in

17

continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952.)

The factual question of whether the sibling relationship exception to termination of parental rights is applicable is reviewed for substantial evidence. The court's weighing of competing interests is reviewed for abuse of discretion. (*In re D.O.* (2016) 247 Cal.App.4th 166, 174.)[6]

## B. *The trial court did not err in determining mother failed to meet her burden of showing the sibling relationship exception existed*

Mother does not dispute Ella and Emily were adoptable. Thus, the juvenile court was required to terminate parental rights and proceed with adoption unless mother met her burden of showing one of the exceptions to termination of parental rights existed. (§ 366.26, subd. (c)(1).) The only exception mother raised was the sibling relationship exception. (§ 366.26, subd. (c)(1)(B)(v).)

Mother was required to show termination of parental rights would be detrimental to Ella and Emily due to substantial

---

[6] Mother points out the question of standing is a question of law reviewed de novo. (*T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1432.) Therefore, mother argues, the issue before this court is subject to de novo review. However, DCFS concedes mother had standing to raise the sibling relationship exception, and while the trial court initially erred in suggesting mother did not have standing to assert the exception, the court ultimately corrected its error and determined mother had not presented sufficient evidence to show the exception existed. Therefore, we find the court's initial error harmless and decline to discuss the issue of standing or apply independent review to the trial court's decision.

interference with a sibling relationship.  (*In re L. Y. L., supra*, 101 Cal.App.4th at pp. 951–952.)  Mother first argued the siblings had a bond, particularly among Isabella, Ella and Emily. While Ella and Emily stated they wanted to be adopted, mother's counsel was not sure they understood that meant they would not have any contact with their biological siblings under the law. Mother's counsel argued it is "likely" Ella and Emily will "lose that contact with all biological siblings once the court terminates mother's parental rights."  She pointed out the caregivers had expressed concern about the aftermath of sibling visits for Isabella.  Counsel pointed out that earlier in the proceedings, the caregivers had wavered in their commitment to provide permanency because of the sibling visits.  While she acknowledged the existence of a sibling consortium agreement, she argued the girls' position would likely change knowing that Isabella would no longer be living with them.

After the court's erroneous statement that mother had no standing to raise the sibling relationship exception, counsel for DCFS corrected the court and pointed out "detriment would have to be assessed by the children who are anticipated to be adopted." Those children were Emily and Ella, who had consistently stated they wanted to be adopted.  In addition, there was no evidence of substantial interference with the sibling relationship, given the existence of the postadoptive agreement and the caregivers' willingness to continue sibling contact.  The court noted its agreement with everything counsel for DCFS had said.

19

Mother's counsel did not dispute the children's counsel's statement that the postadoption contract guaranteed the caregivers would provide sibling visitation.[7]

Mother points out evidence of Isabella's perspective was relevant and may be considered by the court as indirect evidence of the effect the adoption may have on Ella and Emily. (*In re Celine R.* (2003) 31 Cal.4th 45, 54.) Isabella stated she wanted to be with her sisters and was sacrificing her happiness for them. Mother argues these statements reflected the close sibling bond among Isabella, Ella and Emily. However, the court granted Isabella's counsel's request that DCFS be required to facilitate sibling visitation moving forward, ordering that DCFS "make [its] best efforts to facilitate sibling visitation between all of the kids and certainly between Isabella, Joshua, Ella, and Emily." There was no objection to the court's order.

While mother emphasized a previous hesitation on the part of the caregivers to facilitate sibling visitation, the record shows the caregivers had changed their position and showed a willingness to support sibling visits. The caregivers went so far as to agree to a postadoption contract, guaranteeing the

---

[7]     On appeal, mother argues the postadoption contract was allegedly only between the caregivers and the two older siblings. Although it was her burden to show the existence of the sibling relationship exception, mother did not dispute the statements at trial suggesting the contract covered Joshua and Isabella. Regardless of the precise details of the contract, its existence demonstrates the willingness on the part of the caregivers to support Ella and Emily's relationships with their siblings. "[I]t was *appellants' burden* to establish there would be substantial interference, not the Agency's burden to establish there would not." (*In re D.O., supra*, 247 Cal.App.4th at p. 176.)

continuation of contact between the children and their siblings. Mother provided no evidence that the caregivers currently opposed sibling visitation or that Isabella's removal from their home would cause any resistance to visitation. On the contrary, the caregivers had been committed to providing permanence for Isabella and only agreed to have the child re-placed to honor her wishes. The caregivers knew Isabella well and there was no evidence suggesting they would oppose visitation in the future.

There was no evidence the caregivers intended to interfere with any sibling relationships going forward. Mother failed to meet her burden of showing the requirements of the sibling relationship exception were met.

Even if mother had established substantial interference with the children's relationships with their siblings, mother presented no evidence that any potential detriment to the children outweighed the benefits of adoption. As mother admitted, Ella and Emily had consistently expressed a desire to remain in the home of their caregivers, with whom they had established a strong bond and whom they referred to as "mama Mila" and "papa Felix." The children, who were ages five and seven at the time of the section 366.26 hearing, had been in the caregivers' home for over three years. Although Isabella had expressed that she remained in the caregivers' home because of her sisters, Ella and Emily had never expressed any desire to remain with Isabella or any other sibling. Instead, they maintained they wanted to stay with the caregivers.

The trial court did not err in determining mother failed to present sufficient evidence to show the sibling relationship exception. Mother failed to show that Ella and Emily would suffer detriment from substantial interference with a sibling relationship or that any such detriment would outweigh the

21

benefits of a permanent home through adoption by their caregivers.

## II.    ICWA

### A.    *Applicable law*

ICWA was enacted "to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881, disapproved on other grounds in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1152, fn. 18.)

An "Indian child" is defined under California law as an unmarried child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see § 224.1, subds. (a) and (b).)  Under California law, DCFS and the juvenile court "have an affirmative and continuing duty to inquire" into whether a dependent child "is or may be an Indian child." (§ 224.2, subd. (a).)  This includes making an initial inquiry, which "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).)

Federal regulations require the juvenile court to "ask each participant . . . whether the participant knows or has reason to know that the child is an Indian child.  The inquiry is made at the commencement of the proceeding and all responses should be on the record." (25 C.F.R. 23.107, subd. (a); see also § 224.2, subd. (c).)  Further inquiry is required where there is reason to

22

believe that a child is an Indian child.  (§ 224.2, subd. (e).)
Further inquiry includes gathering information from the parents
and relatives and contacting the tribes.  (§ 224.2, subd. (e)(2).)

Once the agency has complied with its duty of inquiry and
there is no reason to know that the child is an Indian child, the
court may find that ICWA does not apply.  (§ 224.2, subd. (i)(2);
Cal. Rules of Court, rule 5.481(b)(3)(A).)  However, before the
juvenile court makes such a finding, it must ensure the agency
has made an adequate inquiry under ICWA and related
California law.  (*In re Dominick D.* (2022) 82 Cal.App.5th 560,
566–567.)  "A juvenile court's finding that ICWA does not apply
implies 'that social workers [have] fulfilled their duty of inquiry.'"
(*Id.* at p. 567.)

Notice to tribes is required if there is reason to know that
the child is an Indian child.  (§ 224.2, subd. (f).)

A trial court's findings relating to ICWA notice and inquiry
issues are reviewed for substantial evidence.  (*In re E.W.* (2009)
170 Cal.App.4th 396, 404.)

**B.**	***Remand for ICWA inquiry is appropriate***

Mother contends DCFS and the juvenile court failed to
comply with their duty of inquiry because the record does not
reflect DCFS asked all available extended family members,
including Manuel R., the only known paternal extended family
member, whether the children had Indian ancestry.  (§ 224.2,
subd. (b).)  DCFS concedes mother's argument has merit.

In *In re Dezi C., supra*, 16 Cal.5th at page 1136, the
Supreme Court held that error resulting in an inadequate ICWA
inquiry requires conditional reversal with directions for the child
welfare agency to comply with the inquiry requirements.  In light
of the Supreme Court's decision, DCFS does not oppose a
conditional reversal of the order terminating parental rights and

remand of the matter to ensure proper initial inquiry is conducted pursuant to ICWA.

## DISPOSITION

The juvenile court's order terminating parental rights to Ella and Emily is conditionally reversed. The matter is remanded with directions that the juvenile court order DCFS to make reasonable efforts to interview the children's available and ascertainable extended family members who were not previously questioned about the children's possible status as Indian children under ICWA. If it is determined the children are Indian children, the matter should proceed pursuant to ICWA. If not, the order terminating mother's parental rights to Ella and Emily is to be reinstated.

CHAVEZ, J.

We concur:

LUI, P. J.

SIGGINS, J.*

---

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.